O. L. MASON, by Next Friend, Respondent, v. ST. L. & S. F. RY. Co., Appellant.

Kansas City Court of Appeals, January 22, 1912.

1. **MASTER AND SERVANT: Negligence.** Plaintiff sued for damages for injuries received while in the employ of defendant as an oiler and air brake coupler of outbound trains, in the freight yards. A rule of the company required oilers to put up signals before they went to work upon trains. This was not done, but plaintiff proceeded with his work and the switching crew backed some more cars on to the train on which he was working, and, being unable to extricate himself in time, he was caught and injured. *Held*, that the injury to plaintiff was due to his own negligence.

2. ———: ———: **Promulgating Rules.** One who employs servants in complex and dangerous business must prescribe reasonable rules for the orderly and safe management of such business and failure to do so is negligence.

3. ———: ———: ———. A servant cannot recover damages for injuries which the observance of the rules, promulgated by the master, would have prevented.

Appeal from Jackson Circuit Court.—*Hon. Walter A. Powell*, Judge.

REVERSED.

*Cowherd, Ingraham, Durham & Morse* for appellant.

(1) Demurrer to plaintiff's evidence should have been sustained. (a) Because plaintiff was clearly guilty of contributory negligence. Renfro v. Railroad, 86 Mo. 302; Van Camp v. Railroad, 141 Mo. App. 344; Moore v. Railroad, 146 Mo. 572; Whiteley v. Railroad, 109 Mo. App. 123; Montgomery v. Railroad, 109 Mo. App. 88; Cahill v. Railroad, 105 Mo. 393. (b) There was no negligence shown on the part of "the servants of defendant engaged in switching and operating the switch engine." Whiteley v. Railroad, supra; Van

Camp v. Railroad, supra; Cahill v. Railroad, supra; Fare v. Railroad, 114 Mo. App. 551. (c) Plaintiff attempts to avoid this conclusive showing of his own negligence and lack of negligence on the part of defendant's employees by attempting to establish a rule or custom that trains were made up thirty minutes before leaving time, and during those thirty minutes they were not to be touched by the switching crew. There was no rule and the testimony does not establish a custom. Shields v. Railroad, 87 Mo. App. 637; Shields v. Railroad, 100 Mo. App. 515. (2) The court erred in giving plaintiff's instruction number 1. (a) There is no evidence that "it became necessary for plaintiff to help out the other air couplers," but on the contrary the testimony shows that plaintiff's own work was not completed. (b) There is no evidence whatever fastening any negligence on "the agents and servants of the defendant engaged in switching and operating a switch engine." See authorities cited under 1, sub. (b). (3) The evidence does show there was a rule requiring a danger signal to be placed on the cars when the men went to work between them and plaintiff and other employees understood that unless such signal was so placed, the cars were liable to be moved at any time. The occasional violation of a rule by an employee does not abrogate the rule. Instruction No. 4, given for plaintiffs was erroneous for the reason there was not sufficient evidence of violation of the Blue Light rule to submit to the jury the question of whether it was still in force. Smith v. Box Co., 193 Mo. 715; Mathews v. Railroad, 227 Mo. 241; Francis v. Railroad, 110 Mo. 387; Schaub v. Railroad, 106 Mo. 92. (4) The court erred in giving plaintiff's instruction number two. (a) There was no causal connection shown between the cinders at the side of the track and the injury received by plaintiff. Swearingen v. Railroad, 221 Mo. 644; Shore v. Bridge Co., 111 Mo. App. 278; Trigg v. Ozark Land Co., 187 Mo. 227;

Goransson v. Mfg. Co., 186 Mo. 300. (b) Plaintiff
was thoroughly familiar with both the defect and the
danger and there was no promise to repair or assur-
ance of safety. Dodge v. Coal & Coke Co., 115 Mo.
App. 501; Harris v. Railroad, 146 Mo. App. 524; Mc-
Manus v. Railroad, 118 Mo. App. 152; Lee v. Railroad,
112 Mo. App. 372; Mattis v. Stock Yards, 185 Mo. 434;
Harff v. Green, 168 Mo. 308; Wytylak v. Coal Co., 188
Mo. 260. (5) Instruction No. 3 given on behalf of
plaintiff was clearly misleading. Instruction No. 9,
asked on behalf of defendant, was a proper statement
of the law and should have been given especially after
instruction No. 3 had been given on behalf of plain-
tiff. (6) Instruction No. 2 which was given by the
court on behalf of the defendant properly states the
law and this instruction was bottomed upon the testi-
mony of the plaintiff himself undisputed by any other
evidence in the case and if the instruction was prop-
erly given, the demurrer to the evidence should have
been sustained. Every fact in said instruction neces-
sary for the jury to find was admitted by the plain-
tiff in his testimony. Campbell v. Stanberry, 105 Mo.
App. 56.

*Wm. H. Wallace, T. B. Wallace* and *H. S. Williams*
for respondent.

(1) The switching crew were guilty of negligence
in shoving in the car, without warning, against the
train on which the plaintiff was coupling air hose.
He was working within the time required of him for
the performance of that duty; and the switching crew
had reason to expect that the air couplers and oilers
would be working under the cars of the train at that
particular time. 23 Amer. & Eng. Ency. Law, p. 746;
Gersley v. Railway, 32 Mo. App. 413; Spotts v. Rail-
way, 111 Mo. 380; Smith v. Fordyce, 190 Mo. 1; Rail-
way v. Dupree, 84 Ark. 377. (2) If the blue light rule

(so called) was not observed as to work of oiling and coupling the air hose on the train or track about which plaintiff was working, and had not been so observed for such length of time as to justify the inference that the defendant knew of it, the rule is abrogated and does not absolve the defendant from a liability which would exist in its absence, a dead rule is in legal contemplation, no rule at all. Rutledge v. Railway, 123 Mo. 133; Francis v. Railroad, 127 Mo. 675; Barry v. Railway, 98 Mo. 69. (3) The question whether the blue light rule (so called) was actually in force as to the train or track in question, or had been abrogated by its disuse was a question for the jury. Tullis v. Railroad, 105 Fed. Rep. 554; McNee v. Coburn Co., 170 Mass. 285; Railway v. Dupree, 84 Ark. 377; Feneff v. Railway, 196 Mass. 575; Railway v. Nichols, 2 U. S. App. 369; Brady v. Railroad, 206 Mo. 536. (4) There was evidence to justify the inference that the defective condition of the track was a cause of the injury, and plaintiff's instruction No. 2, submitting this question to the jury was proper. Settle v. Railway, 127 Mo. 336; Soeder v. Railway, 100 Mo. 673; Younge v. Railway, 133 App. 148 et seq.; Kelley v. Railway, 70 Mo. 604; Buesching v. Gas Light Co., 73 Mo. 219. (5) The defendant's instruction No. 5, was properly refused. If the danger arising from the defective condition of the track was not so apparent that a reasonably careful and prudent person would refuse to perform such work at that place the plaintiff was not negligent in continuing in the employment no promise to repair or assurance of safety—was necessary. This question was properly submitted in plaintiff's instruction No. 2. Settle v. Railway, 127 Mo. 336; Huhn v. Railway, 92 Mo. 440; Wendler v. House Furnishing Co., 165 Mo. 527; Pank v. Beef and Provision Co., 159 Mo. 467; Smith v. Kansas City, 125 Mo. App. 150; Devore v. Railroad, 86 Mo. App. 429.

JOHNSON, J.—This is a suit by a servant against his master to recover damages for personal injuries alleged to have been caused by negligence of the master. In addition to a general denial the answer interposed defenses of assumed risk and contributory negligence. Plaintiff prevailed in the circuit court and defendant appealed.

The injury occurred shortly after two o'clock in the morning of November 18, 1909, in the yards of defendant in Kansas City where plaintiff was employed as an oiler. He had served in that capacity for about three months and it was his duty to inspect and put in order the oil boxes of cars in outbound trains and also, when necessary, to assist in coupling air hose. He began work at six o'clock in the evening and remained on duty during the night. At the time of his injury he was engaged in inspecting oil boxes and in coupling air hose on a regular freight train scheduled to leave the yards at half past two o'clock. This train was known as No. 137, and was made up in the yards where plaintiff was employed and generally, and on this occasion, on track No. 11. The tracks of this yard run north and south and converge into a main or lead track going south to the main line. The train in question was headed south and it was the duty of the switching crew to collect and assemble the cars, of which the train was to consist, and to complete the work of making up the train thirty minutes before the time of departure, in order that the oilers and air hose inspectors might have thirty minutes in which to do their work. The switching crew were expected to set the train back on its track far enough to prevent it from fouling the lead track after the road engine was backed in and attached to the train. The oilers and air hose inspectors were not expected to begin work on the train until after the work of the switching crew was completed. Defendant had promulgated the following rule for the protection of

workman, such as plaintiff, whose duties required them to go between, under and about cars standing in the yards:

"A *blue* flag by day and a *blue* light by night, dis-, played at one or both ends of an engine, car or train or displayed in center of track indicates that workmen are under or about cars or train on that track. When thus protected it must not be coupled to or moved. Workmen will display the *blue* signals and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as.to in-tercept the view of the blue signals, without first noti-fying the workmen."

Plaintiff admits he had been told of this rule by his foreman but claims he had not read it, though, with other rules, it was properly posted by defendant. On this subject plaintiff testified:

"You did know the rule in regard to putting up the blue light? A. Just through him (the foreman), I never saw the rule book.

Q. You saw these little printed circulars passed around, everybody had. A. They showed them to me.

Q. You had never seen them? A. I saw them lying there but I never read them hanging on the file. . . . . Q. You knew the blue light was a signal that the men must not put cars on the track? A. Yes, sir. Q. And you knew unless there was a blue light signal or somebody standing there to keep them from putting cars in on the tracks they were likely to put cars in on the tracks where they were making up the trains? A. If the trains wasn't made up they would. Q. If the train was not made up, if there were any other cars to come along they were likely to put them in? A. Yes, sir."

The blue light signal was not placed on the train in question and from the foregoing testimony it is clear plaintiff knew that if by any chance the making

up of the train had not been finished when he began his work, the switching crew would back cars into the train without notice or warning. Plaintiff further testified that the blue signal had not been placed on train No. 137 during the time of his employment as oiler, and it is the contention of his counsel that the rule had been abrogated by a custom of non-observance of which defendant must have had knowledge. Shortly before two o'clock plaintiff left the switch shanty and with lantern in hand proceeded to track No. 11, to begin his duties of inspecting the oil boxes and coupling air hose. His observation of the situation convinced him that the train had been made up. Apparently the switching crew had departed and at two o'clock plaintiff, starting at the south end, went along the west side of the cars inspecting and attending to the oil boxes. In ten minutes or more he reached the north end of the train and, beginning on the east side, proceeded to help the air hose inspector who also was at work on the train. Plaintiff went in between the way car and the freight car in front of it to couple the hose. This task required the employment of both hands and while he was in its performance the switch engine backed in with some additional cars for the train. Hearing the noise of the collision, plaintiff hastened to extricate himself from his dangerous position, but the track was in bad repair and hindered his escape. His left foot was caught under the wheel of the moving freight car and crushed, necessitating the amputation of the foot and ankle. The fact is that the switching crew had not finished their work of making up the train and there is no evidence that they had actual knowledge of the fact that the car inspectors had begun work. No notice or warning was given of their purpose to switch in additional cars.

It is the contention of plaintiff that a rule of defendant required trains to be made up thirty minutes before their scheduled time of departure and that when

he went to work he was justified in assuming that the switching had been done and that warning would be given him of any contemplated interference with the train. We quote from his direct testimony:

"Q. What did Babcock (the foreman) tell you was the rule ? A. He told me the train was to be made up thirty minutes before leaving time. Q. What do you mean now by, the train was to be made up before leaving time? A. All freight cars were to be on the train before road engine was to be hooked on, supposed to be standing still on this track they were made up on.

"Q. During what period was it you oilers and air couplers were to do your work? A. It was in this thirty minutes' time, this train was due out at two-thirty, and it was between two and two-thirty.

"Q. And when was the engine to be coupled on? A. It was to be coupled on after we got this work done."

On cross-examination, he testified: "Q. Now you stated that Mr. Babcock told you a train ought to be or would be made up thirty minutes before its time for departure? A. Yes, sir.

"Q. You knew they were sometimes late being made up? A. This train?

"Q. I ask about these trains, talking about trains? . . . You knew the trains were sometimes late in being made up? A. Yes, sir. Q. So they would not get them made up until about the time they were going out? A. Yes, sir.

"Q. Now, the trains started out late sometimes? A. Yes, sir.

"Q. Now when you say that Mr. Babcock told you that the trains would be made up thirty minutes before going out you might oil them, do you mean that you understood you would have thirty minutes after the train was made up in which to do this oiling? A. Yes, sir.

"Q.  So that after the train was made up you understood you would have thirty minutes to do your work?  A.  Yes, sir."

A witness introduced by plaintiff who had been an oiler in defendant's yard testified, on cross examination:

"Q.  And the way they made up a train was this, the switching crew in control of it would set in first the caboose?  A.  Yes, sir.

"Q.  The car which went at the end?  A.  Yes, sir.

"Q.  Then they backed up to the other cars from the different places they might be in the yards and took them and put them in on that track?  A.  Yes, sir.

"Q.  And unless there was a blue light there to notify them they must not kick in, they could put them in at any time?  A.  Yes, sir.

"Q.  Now, it is true in making up cars and trains down there they were not always made up on time?  A. No, sir.

"Q.  Sometimes a train would not be made up until it was practically time for it to go out?  A. Yes, sir.

"Q.  And sometimes even after time for going out before they would get all of the cars in?  A. Yes, sir.

"Q.  You stated as an inspector you sometimes went in and coupled up these cars without any blue light or blue flag on the track; I will ask you if it is not a fact that when you did that you knew you had to watch out for that engine and see it didn't catch you putting cars in?  A.  Yes, sir;  I always looked out for the engine.

"Q.  And isn't it a further fact that when you did that you only did it on occasions either when you saw the engine had gone so far away it could not get back until you did that work you intended to do or had

some man out in front looking out for it? A.   Yes, sir.

"Q.   And you didn't do it at any other time? A.   I did it when I didn't know they were going to throw in cars or not, they may throw in a car from the upper end of the yards and still the engine not come in on the track.   Q.   But you knew when you did do it they were likely to do that?   A.   Yes, sir.

"Q.   And you knew the danger and that you were unprotected?   A.   Yes, sir.

"Q.   And you never did this without keeping a lookout for the engine or having somebody else keep a lookout for it?   A.   Not all of the time, there was not always somebody on the head end to look out.

"Q.   If you didn't look out for yourself and nobody there to look out for you you would still take the chance of getting caught?   A.   Yes, sir.

"Q.   And you still took that chance?   A.   Yes, sir.

"Q.   There was no way in which the switchmen could know you were in coupling up unless there was a blue light or blue flag out?   A.   Yes, sir.

"Q.   That is true?   A.   Yes, sir."

Plaintiff testified that he was around or near the south end of the train for fifteen minutes before he started to work and that no cars were added to the train during that time.   Further his counsel endeavored to elicit testimony from him to the effect that before beginning his work he inquired of a switchman working nearby whether or not the train was made up and received an affirmative answer but the court ruled out the testimony on the ground that the switchman was not a member of the switching crew that was making up train number 137 but was doing other work in the yards.

We have stated the principal facts of the case as disclosed by the evidence most favorable to plaintiff and we pass to the consideration of the questions

raised by the demurrer to the evidence which defendant insists should have been sustained. The controlling question is whether the injury of plaintiff was caused by his own negligence in going into a place made dangerous by the certainty that other cars would be added to the train or by the negligence of the switching crew in backing other cars into the train without first ascertaining if oilers and air hose inspectors were at work and warning them of the intended movement. If negligence of plaintiff caused or contributed to his injury he cannot recover, but if his injury was caused wholly by negligence of the switching crew, he has a good cause of action against defendant.

Negligence consists of the breach of some duty a person owes either to himself or to another and unless defendant owed plaintiff the duty of giving him warning of any proposed interference with the train during the thirty minutes preceding the scheduled time of its departure, he cannot successfully accuse defendant of negligence in proceeding with the work of making up the train without taking thought of the oilers and air hose inspectors.

"A railway yard is a dangerous place but before the company operating it can be made liable for an injury received by one who is lawfully within it, it must be shown that the injury resulted from the negligent or wrongful act of the company or its employees." [Whitley v. Railroad, 109 Mo. App. 1. c. 131.]

Because of the complexity, magnitude and dangerous nature of the work conducted in railroad yards the law imposes on such companies the duty of providing and reasonably enforcing an intelligent and uniform system of doing such work. Rules and regulations prescribing the order in which various movements shall be executed, the precedence to be accorded to certain classes of employees over others, and the duties of employees towards each other with re-

spect to giving warning or instructive signals are essential to the proper operation of the business and to the safety of the company's employees. The failure of a railway company to perform its duty of promulgating such reasonable rules, of itself, would be negligence, since it would be a breach of a duty the company owed its employees.

"One who employs servants in complex and dangerous business ought to prescribe rules sufficient for its orderly and safe management. His failure to do so is a personal negligence, for the consequence of which he is liable to his servants." [Reagan v. Railroad, 93 Mo. 352.]

And as a companion to this rule another, recognized by the courts of this state is that where a railroad company has made and promulgated reasonable rules and regulations for the orderly operation of its yards, a yardman injured in consequence of his disobedience of such rules or of his neglect to avail himself of the benefit of a rule designed for his protection can have no cause of action against his master on account of his injury. As is said by the Supreme Court in Francis v. Railway, 110 Mo. l. c. 395:

"It would be most unreasonable and unjust, after imposing upon the master the duty of promulgating a rule for securing the safety of his servant, to permit the servant to recover from the master damages for injuries which the observance of the rule would have prevented. As the master is bound at his peril to make the rules, the servant should be equally bound at his peril to obey them. In such cases the disaster is brought upon the servant by his own voluntary act, and he, and not the master who had discharged his duty, should bear the consequences. So it has been uniformly held. [Schaub v. Railroad, 106 Mo. 74; Alcorn v. Railroad, 108 Mo. 81; Railroad v. Thomas, 51 Miss. 641; Shanny v. Androscoggin Mills, 66 Me. 429; Lockwood v. Railroad, 55 Wis. 50; Zumwalt v.

Railroad, 35 Mo. App. 667; Lyon v. Railroad, 31 Mich. 429.]''

Plaintiff does not found his cause of action on any neglect of defendant to make and promulgate sufficient rules for the government of its yards but his first claim is that the switching crew violated the rule giving thirty minutes to oilers and air hose inspectors for the performance of their duties in the preparation of outbound trains. It appears to be the idea of plaintiff that when two o'clock came he had the right to assume, without investigation or inquiry, that the train was made up, would not be molested by the switching crew and that in security he might proceed with his work without guarding his train with the blue signal. The version of the thirty minutes rule appearing in the quotations we have made from his own evidence does not sustain this idea. Of course it was the intention of the rule that trains should go out on time, but the contingency of the departure of trains being delayed occasionally was taken into account and the rule did not contemplate, nor is it susceptible of such construction that the half hour succeeding two o'clock belonged to the oilers and inspectors of air hose and could not be appropriated by the switching crew without notice to them. Clearly the rule intended that the latter class of employees should have thirty minutes for their work, and that they should not begin until the train was made up. It was defendant's right and we will add, its duty, to designate on whose shoulders should fall the duty of ascertaining when the train was made up. We said in Lancaster v. Railroad, 143 Mo. App. l. c. 173:

''Undoubtedly, defendant would have had the right to require its yardmen, including car inspectors, to look out for engines and trains and to keep out of their way and to relieve train men from the duty of giving warning signals to such employees. As we have observed in other cases, the business of operating a

railroad being highly complex, calls for a strict adherence to system and discipline and within the bounds of reason, a railroad company may establish rules of precedence among its various classes of vehicles and employees, and may require that one class shall accord the right of way to another. [Mack v. Railway, 123 Mo. App. 531; Williamson v. Railway, 139 Mo. App. 481.] And where the rules of the company give an engineer the right of way over yard employees, he has the right to presume, until the contrary fact clearly appears, that such employees are on the lookout and will get out of his way. In such cases, the risk of injury the yard employee incurs must be classed as one of the natural risk of the business conducted by the master in his own way and within the limits of reasonable care, and, as such, a risk assumed by the servant."

The rule under consideration did not require the switching crew to give notice to other yardmen of the completion of its work but did require the oilers and inspectors to ascertain that fact for themselves. Plaintiff's conduct shows he had such understanding of the rule. He went to the train fifteen minutes before two o'clock for the purpose—he could have no other—of acquainting himself with the facts relating to the making up of the train and he made inquires of a yardman, though of one on whose statements he had no right to rely. These facts demonstrate that he knew he had no right to assume the train would be made up at two o'clock or that if the switching were not completed, he would be warned of the shunting of cars on that track. The truth of the matter is that, deceived by appearances, he came to a false conclusion and neglected to perform a duty imposed on him by the rules, the performance of which would have prevented the injury. That duty required him to know that the train was made up and if the means of accurate information were not readily obtainable, to protect himself by putting up the blue signal. It is idle to talk

about the blue signal rule as abrogated by a custom of non-observance. The evidence of plaintiff shows it was being used in the yards though not on track eleven and, what is still more to the point, the evidence further shows that switching crews invariably observed that rule, respected the signal, and that had plaintiff put up the light the cars would not have been shunted in without warning being given him. Thus it appears that the rule was alive and not dead, since it was constantly observed by those whose duty it was to obey it. The mere fact that those for whose benefit it was specially designed, failed at times to employ it, especially in instances where its use appeared unnecessary, is not proof of the existence of an abrogative custom.

The conclusion is irresistible that the injury of plaintiff was not due to any negligence of defendant, but was caused by his own negligence.

The judgment is reversed. All concur.