THOMAS E. HILL, Respondent, v. KANSAS CITY SOUTHERN RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, October 5, 1914.

1. MASTER AND SERVANT: Assumption of Risk: Negligence: Personal Injuries. Plaintiff's duty as a switchman required him to uncouple a string of cars standing on track 11 and ride with the string upon the lead track down to the switch of track No. 1 and there drop off and after the last of the string had passed the switch, to open the switch and signal the engineer to back the string onto track 1 where the last two cars were to be left because they had been labelled "bad order" by the inspector. The "bad order" consisted in the fact that a load of piling placed in twin-load fashion on the two flat cars had slipped back a little from where they had been originally loaded. In riding down to switch No. 1 plaintiff sprang upon one of said flat cars and stood with his feet on the oil-box, or hub of the front wheel, and held by his left hand to the standard placed on the side of the car to keep the load from rolling off sideways. It was a custom not to allow any other train to come into the yard on the lead track while the switch train was thereon, and when a train was allowed to come in to notify the switch crew of that fact. On this occasion a train was permitted to come onto said lead track without notifying the switch crew. Consequently, while plaintiff was riding in this position, the engineer was compelled to make a sudden, abrupt, violent and unusual stop in order to avoid a collision. The stop caused the load of piling to slip forward and crush plaintiff's arm against the standard. Plaintiff's position was the usual position taken to ride a flat car. *Held*, that as the bad order placard notified plaintiff that something was the matter with the car, and he chose to get upon that car without knowing what that something was, and if he was injured as a result of that defect in the usual and ordinary manner of dispatching business, unaffected by any other in-

dependent act of negligence on the part of defendant, then he assumed the risk of such danger. But as the danger did not arise from and was not caused by the usual and ordinary method of doing the business but through the negligence of defendant independent of and unrelated to the defect on the car, he cannot be deprived of recovery on the ground of assumption of risk. [Distinguishing Hager v. Terminal Railroad Assn., 207 Mo. 302.]

2. NEGLIGENCE: Violation of Custom: Evidence: Jury Question. It requires less evidence to establish the existence of a rule obviously necessary for the safety of employees than one having no relation to safety. And where the witnesses testify to facts showing the general uniformity and notoriety of the custom this is sufficient evidence of a custom. And where the dispute is not over the existence of the rule or custom but whether it extended over a certain track or not, such extension is a question of fact for the jury.

3. INSTRUCTIONS: Riding Car Known to be Defective. An instruction asked by defendant which told the jury that if plaintiff knew the car was in bad order because its load had shifted, and he chose to ride thereon and was injured by the load shifting back caused by the train being stopped, then he could not recover, was properly modified by inserting after the word "stopped" the words "in the usual and ordinary manner in handling cars in said yards" since only the damages arising from said defect in the ordinary way of doing business were thereby assumed by plaintiff and not the unusual hazards caused by defendant's negligence in other matters.

4. ——: ——. For the same reason it was not error to refuse an instruction asked by defendant which told the jury that if plaintiff knew of the placard it was his duty to ascertain the nature of the defect, and if ,he chose to ride on such a car and was injured he could not recover no matter how negligent defendant may otherwise have been.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas*, Judge.

Affirmed.

*Cyrus Crane* and *Geo. J. Mersereau* for appellant.

(1) The plaintiff's action in voluntarily riding on a car which he knew to be in "bad order" prevents his

recovery. Hager v. Terminal Ry. Association, 207 Mo. 302. (2) The evidence is insufficient to make a case of negligence against defendant. The alleged custom in regard to the use of the yards was not proven. Shields v. Railroad, 87 Mo. App. 637; Boyd v. Graham, 5 Mo. App. 403; Lee v. Railroad, 195 Mo. 400.

*Walsh, Aylward & Lee* for respondent.

(1) Voluntarily riding upon the car in question, which happened to be labeled "bad order," does not prevent plaintiff recovering in this case. O'Flanagan v. Railroad, 145 Mo. App. 276. (2) The evidence is sufficient to make a case of negligence against the defendant. Mason v. Railroad, 161 Mo. App. 620; Lewis v. Railroad, 142 Mo. App. 585. (3) The custom in regard to the use of the yards was abundantly proven. Barry v. Railroad, 98 Mo. 69; Yost v. Railroad, 245 Mo. 245. (4) The court did not err in modifying defendant's instruction No. 1 and in refusing to give defendant's instruction No. 6. Bible v. Railroad, 169 Mo. App. 532; Briscoe v. Railroad, 130 Mo. App. 521; Utley v. Talfree, 77 Mo. 309; Bowles v. Lewis, 58 Mo. App. 653; Mateer v. Railroad, 105 Mo. 353.

TRIMBLE, J.—Plaintiff was foreman of a switching crew in defendant's railroad yard in that part of Kansas City, Missouri, known as the East Bottoms.

So far as this case is concerned, the railroad yard in question contains parallel tracks numbered consecutively from one to twenty-two both inclusive, all connected, by proper switch facilities, with a single track called the "lead track" or "North Yard lead track." This lead track ran practically east and west and the numbered tracks ran off from it in a general northwest direction at such an angle that cars or trains of cars could be brought along the lead track and pushed on to any particular switch track desired, or a train

of cars could be taken off of any particular track and
the individual cars composing such train could be dis-
tributed to the various parallel tracks desired accord-
ing to where they were wanted or were intended to
be when ready to be used or transported further. The
work of distributing these cars to the different tracks
was called "breaking up" trains. And, as stated be-
fore, plaintiff was foreman of defendant's switching
crew engaged in this work.

From the switch of track No. 11, measured east
along the lead track, to the switch of Track No. 1 was
about fifteen car lengths or about 540 feet. Track No.
1 was the "repair track" on which cars were set which
the inspector found were out of order. There they
would be repaired by men engaged in that work. The
particular track upon which a car should be put was
designated in some way on the car. Those needing re-
pairs and having to go upon track No. 1 or the "rep
track" as it was called, were designated by a placard
tacked thereon bearing the words in bold letters "Bad
order." On this card in ordinary script was written
the nature of the defect and of the repair to be made.
It was the duty of the switchmen to place cars bear-
ing these "bad order" cards upon the "rep track,"
but the writing thereon specifying the nature of the
defect and of the repairs to be made was for the re-
pair men and not for the switchmen, and the latter
were not required as a part of their work to read
this part of the card.

About 4:30 p. m. February 13, 1912, plaintiff and
his crew were engaged in "breaking up" a train of cars
standing on track No. 11. The engine backed from the
lead track on to said track No. 11 and coupled on to
the nearest end of the cars, (which in railroad parlance
was the east end). Plaintiff uncoupled fifteen of the
cars from the rest, (that is, he uncoupled the connec-
tion between the 15th and 16th cars). This left the
engine attached to a string of fifteen cars ready to go

out of track No. 11 on to the lead track where the
fifteen cars could be distributed and set on the differ-
ent tracks required.

The two cars at the west end of this string and
farthest from the engine were flat cars loaded with
long, heavy, piling or logs.  These logs were too long
to be loaded on one car, so they were placed on the
two cars, making what is known as a twin-load, with
the ends of the piles about the same distance from the
ends of the cars.  On these two flat cars was a "bad
order" placard, and the switchmen were therefore re-
quired to place these two cars on track No. 1, the "rep
track."  To do so the entire string of fifteen cars had
to be pulled out of track No. 11 on to the lead track
and taken east thereon past the switch to track No.
1, and then after this switch had been opened the en-
gine would back the string in upon track No. 1 where
the two cars would be left.

After the string of fifteen cars had been uncoupled
from the others as above stated, the engine started
out with the fifteen cars upon the lead track on its
way to track No. 1.  It was plaintiff's duty, as soon
as he had uncoupled the string and it had started, to
ride on the string down the lead track till he reached
the switch to track No. 1, and then drop off while the
train was yet going east, and after it had fully passed
the switch at track No. 1, to open said switch and give
the signal to back in upon said track 1.  Plaintiff
sprang upon the journal or oil-box at what a layman
would call the hub of one of the front wheels on the
south side of the second of the two flat cars, (being
the 14th from the engine) and, holding with his hands
to one of the standards, (or upright wooden stakes at
the side of the car, a number of which were alongside
the car to prevent its load from rolling off to the side),
rode in this position west on the lead track till he got
in about five car lengths, or 180 feet, of the switch to
track No. 1 when the fifteen cars and engine made a

sudden, extraordinary, abrupt and unusually hard stop. Plaintiff's hand was clasping the upright standard just above the floor of the car, and the quick, hard stop, (made while the cars were going six miles an hour), caused the load of heavy piling to slide forward on the car for about two feet catching plaintiff's hand and arm between the piling and the standard and crushing those members of his body.

For this injury plaintiff brought this suit alleging negligence upon the part of defendant in several particulars the most important of which now are that defendant negligently permitted a train to come onto the lead track and move west thereon at the same time that the switch train was going east, without notifying plaintiff or the crew of that fact, in violation of a custom prevailing in the yard not to allow another train upon said lead track while the switch train was thereon or to permit such other train to come on to said track without informing plaintiff or his crew of that fact; and that defendant negligently failed to give such notice, thereby causing the string of cars on which plaintiff was riding to be brought to a sudden, violent, abrupt, and unusual stop in order to prevent a violent collision; and that in thus negligently and carelessly causing and permitting said string of cars to be brought to such a stop and making the load of piling to shift, plaintiff was, without any notice or warning, caught and injured, all through the negligence of defendant as aforesaid.

There was ample evidence to prove that a train did come upon the lead track and was going west at the time that the switch train was going east thereon; that the stop made was sudden, violent, abrupt, and unusual and was made in order to avoid a collision; that the sudden and violent stop caused the piling to slide forward and catch and crush plaintiff's arm; that no warning or notice of the fact that this other train

182 Mo. App.—25

was coming in on the lead track was given plaintiff or his crew; that the position taken by plaintiff on the flat car in riding down the track was the usual position taken by switchmen on a car in doing such work, and it was necessary and proper for him to ride on the train of cars down to the switch in order to perform his duties required at that point.

It seems that the reason the two flat cars were placarded "bad order" was because the inspector discovered that the load of piling thereon had shifted or slipped back (to the west) from where they were originally loaded. And on the placard was written "load shifted" as the specific trouble with the car. Defendant, therefore, insists that plaintiff cannot recover because he voluntarily rode on a car which he knew to be in "bad order" and thereby assumed the risk attending such act. In taking this position defendant relies upon the case of Hager v. Terminal Railroad Association, 207 Mo. 302, and claims that the principle there announced forbids plaintiff's recovery.

While the evidence in the case at bar tends to show that the writing on the placard specifying wherein the car was in bad order is for the repair men and not for the switchmen, and that the latter do not stop their work to see what the trouble is, but merely take the placard as notice to put the car on the "rep track;" and while it also tends to show that plaintiff did not know the load had shifted to the west when he got on the car and took hold of the standard; yet the case may be considered, and perhaps should be considered, on the theory that the "Bad order" placard was a notice to him that the car was defective and was also a notice to him of its particular defect, since if he were going to ride on that car he owed it to himself to learn wherein the defect consisted.

In the Hagar case the injured servant knew that the car was "off center," but the decision seems to hold that the placard "bad order" gave him notice

that it was defective and consequently notified him of the particular defect, because he owed it to himself to learn what the defect was, if he chose to ride thereon. While the decision is not placed on this ground, yet we understand such to be the principle announced, since the court on page 317 says, (speaking of the injured servant) "knowing that the master was bound to handle defective cars he was obligated to look out for such cars."

Whether the Hager case announces this principle or not, it is clear that the servant's work required him to handle "bad order" cars, and that the placard plainly told him that *something* was the matter with the car. And it would seem that if he chose to get upon that car without knowing what that something was, and was injured as a result of that defect in the usual and ordinary manner of dispatching the business, *unaffected by any other independent act of negligence on the part of defendant,* then he should be said to have assumed the risk and cannot recover. But if the defect in the car was such that, in the usual and ordinary routine and manner of doing the work, it would not have injured plaintiff and did so only because of defendant's negligence in a matter wholly independent of and unrelated to the defect, then it is not seen how plaintiff can be barred of recovery on the ground of assumption of risk, since the servant never assumes the risk of the master's negligence. Indeed, in the situation last stated, it is the defendant's unrelated, independent act of negligence, and not the defect in the car, that is the real cause of the injury.

Such is the situation in the case at bar. The load had shifted, that is, it had slid back from where it had been originally loaded. And even if plaintiff was constructively notified of this shifting by the placard, yet the danger apprehended by the inspector from the shifting was not that the load would slip back again into place, but that, owing to change in its location,

there was danger of the logs rolling off to the side. And while the fact that the load had slipped backward a few inches or possibly two feet might indicate that, given the right conditions, it was possible for it to slip forward again, yet there was no reason for thinking it would do so during the time plaintiff would ride from switch No. 11 to switch No. 1, the train being in motion and going forward all the time. Plaintiff had to get off at the switch while the train was yet going and it must continue on in the same direction until the last car of the string had passed east of the switch, then it would be stopped by plaintiff and under his orders would be backed in on track one, but when the train would stop plaintiff would be on the ground, and wholly out of danger even if such a stop as that, (which would be a reasonable and not unusual or violent stop), would cause the load to shift back into place. There was no evidence that it had, theretofore, under the usual and ordinary stops, shifted backwards and forwards but merely that it had slipped backward and remained there. Nor was there anything to show that it was likely to shift forward. And during the time of plaintiff's ride on the car there was no possibility of its doing so had it not been for the sudden, unprecedented and violent stop made necessary by the negligence of defendant in allowing, without warning or notice, the other train to come upon the track.

In the Hager case, the negligence charged was not an independent act of negligence unrelated to the defective car nor was the injury caused by such independent act. The injury occurred as the sole, direct, and immediate result of the car being "off center" causing it to lean or come much nearer to one side than usual and thereby to crush the switchman's legs against a bridge support adjacent to the track. The servant not only had constructive but actual knowledge of the fact that the car was off center. He got off once fearing to ride thereon, but later got on and was

injured as the direct result of the defective condition of the car and not of any negligence on the part of the company. The facts in the case are wholly dissimilar from the case at bar, the basis of the recovery is entirely different, and for this reason the case does not forbid plaintiff's recovery, upon the jury finding facts as hereinbefore stated. In the case at bar, the danger to plaintiff was not merely *enhanced* by defendant's negligence, as in the case of O'Flannigan v. Mo. Pac. Ry. Co., 145 Mo. App. 276, but it was *caused* thereby. At least it was a question for the jury to solve and was submitted to them and they said it was so caused. And there was ample evidence to support such finding.

It is next asserted that there is no evidence showing negligence on the part of defendant. This rests primarily on the claim that the alleged custom of not allowing another train on the lead track without notifying the train crew, was not shown to be general, uniform, certain and notorious in character as to be of any service as a custom or so that knowledge thereof and reliance thereon may be presumed. In the first place, the practice of not allowing a train on the track without notifying a train crew using or liable to use the same at any moment is so reasonable and necessary to avoid collisions thereon that it would seem that it would require less evidence to establish such a custom than it would a custom not so absolutely necessary to safety. In the next place, several witnesses testified that such was the custom and testified to facts which, if true, showed that it was general in that yard, uniform and well known to the employees thereof. In the third place, defendant's witnesses showed that there was such a well-known custom, but claimed that it did not apply to the lead track but only to a portion of the "air line" track. Such a custom did really exist according to all parties, but the dispute was over whether it covered the lead track. This was a ques-

tion of fact for the jury to settle. The evidence was sufficient to show that the work was done according to that rule or practice; that it was for the safety of the employees; and if it has been followed, the employee has the right to have the same observed for his protection and a violation of such practice is negligence, even though the rule be not printed nor published. [Mason v. St. Louis & San Francisco R. Co., 161 Mo. App. 610; Lewis v. Wabash R. Co., 142 Mo. App. 585.] The custom was sufficiently proven. [Barry v. Hannibal, etc. R. Co., 98 Mo. 62, 69; Yost v. Union Pacific R. Co., 245 Mo. 219, 246.]

The negligence of defendant may not have consisted in violently stopping the train since that may have been necessary to avoid a collision. The negligence that is certain consisted in permitting a situation to arise where it became necessary to make such a violent, abrupt, and unusual stop. If the negligence rendered necessary the unusual stop and the stop caused the injury, then there was an unbroken sequence from the negligence to the injury and the former was the proximate cause thereof.

The trial court modified defendant's instruction No. 1. As requested by defendant it told the jury that if "plaintiff knew that the car on which he was riding was a bad order car and knew that the car was marked "bad order," because the load of piling thereon had shifted to the west and that by reason thereof it was dangerous or liable to shift again if the train was stopped (here the court inserted the words "in the usual and ordinary manner in handling cars in said yard") and notwithstanding such knowledge, attempted to ride on said car by standing on the boxing and holding to a stake from which the piling had separated and that when the train stopped his injury was caused by shifting of the load of piling to the east, then you are instructed that he cannot recover in this case and your verdict must be for the defendant."

It is claimed that the inserting of the words "in the usual and ordinary manner in handling cars in said yard" was erroneous. We think not. Plaintiff assumed only the risk arising from the usual and ordinary method of doing the business. He is not required to anticipate that possibly his master will be negligent. [Bible v. St. Louis & San Francisco R. Co., 169 Mo. App. 519; Briscoe v. Chicago, etc. R. Co., 130 Mo. App. 513.]

The refusal of defendant's instruction No. 6 is complained of. It is as follows: "The court instructs the jury that it is admitted in this case that the car on which plaintiff was riding was plainly marked "bad order" and that plaintiff knew it was so marked, you are therefore instructed that with such notice to plaintiff, it became his duty to ascertain if he could do so from the said bad order tag or in some other suitable way in what respect the car was in bad order before attempting to ride on the same; and if you further find that he could have ascertained its condition or wherein it was in bad order by an inspection of the bad order tag or the load itself on the car and thereby have ascertained that the load had shifted and that in consequence thereof it was dangerous to ride on the same in the manner in which plaintiff attempted to, and if you further find that the plaintiff failed to so ascertain or to attempt to ascertain the condition of said car and wherein it was in bad order and received his injury while riding on the same by reason of the load shifting to the east when the train stopped, then he cannot recover and this is true even though you may find there was negligence on the part of the defendant in regard to some matters submitted to your consideration in this case." It will be noticed that this instruction differs from the others defendant asked. The others contained the condition that if plaintiff knew the car was marked "bad order" "because the load of piling thereon had shifted to the west etc."

No 6, however, tells the jury that as plaintiff knew it was in bad order it was his duty "to ascertain if he could do so from said bad order tag or in some other suitable way in what respect the car was in bad order before attempting to ride thereon." So far as plaintiff's duty to the *master* was concerned he was not required *as a part of his work* to ascertain what was the particular defect of the car. There was no evidence to that effect and none that if the tag did not disclose the defect he should discover it "in some other suitable way." Perhaps plaintiff's duty to *himself* did require that he should ascertain what was the particular defect before attempting to ride upon the car. And if the mere riding thereon in the usual and ordinary method of switching the cars had caused the injury, doubtless his lack of *actual* knowledge of the defect would not aid him to a recovery, but he would be held to have assumed the risk because he knew of the placard. But he would not be required to ascertain "in some other way" wherein lay the danger if the card did not disclose it. And the card did not disclose to him the *danger* but merely that the load had "shifted" and the evidence was that the load *"looked like any other load."* So that under instruction No. 6 the jury could well think that if plaintiff stopped and read the placard and saw the words "load shifted" but could not see from observing it that it was different from any other load, yet nevertheless he must stop and ascertain in some other way just what was the trouble and wherein it was different from other loads.

But aside from this, under the principle hereinbefore announced that the placard was constructive notice to him that the load had shifted, instruction No. 6 is not erroneous because it told the jury that if plaintiff wanted to ride on the car it was his duty to look at the card and see what was the matter. The main and vital error consists in telling the jury that if he

did this he cannot recover no matter what the negligence of the defendant, independent of and unrelated to the defect in the car, may have been and without regard to whether the stop was such as was reasonably and ordinarily made or not. Such is not the law. Although plaintiff, by riding upon a car known to be in bad order, may have assumed the risks arising therefrom, whether he knew or did not know of the particular defect, but it was only such risks as arose out of the usual, ordinary and careful management of the business, and not such risks as arose from such other negligent act of defendant, which plaintiff could not and was not required to anticipate. The refusal of instruction No. 6, therefore, did not constitute reversible error.

The judgment is affirmed. The other judges concur.