EDWARD B. HAGER v. TERMINAL RAILROAD
ASSOCIATION OF ST. LOUIS, Appellant.

### Division One, November 27, 1907.

**MASTER AND SERVANT:  Defective Car:  Servant's Knowledge.**
Where the servant, a switchman of mature years and experi-
enced in his employment, knew that his master's business was
to handle all kinds of cars, defective and otherwise, and
that the car which caused his injury was "off center" and
defective, and he possessed all the knowledge his master pos-
sessed both as to its defective condition and the danger in-
cident to handling it, and so knowing deliberately of his own
choosing mounted the car and attempted to ride thereon, and
as it leaned to one side as it was being hauled was struck by
a bridge pier as he was attempting to leave it, he cannot re-
cover.

Appeal from St. Charles Circuit Court.—*Hon. H. W.
Johnson,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. E. McKeighan* and *William R. Gentry* for ap-
pellant.

(1) The demurrer to the evidence should have been
sustained because none of the negligence charged in
the petition was shown. A plaintiff can never recover
in a negligence case without proving some negligence
on the part of defendant. Harper v. Railroad, 187 Mo.
575; Chandler v. Gas Co., 174 Mo. 321. (2) The de-
murrer to the evidence should have been sustained be-
cause plaintiff was guilty of negligence which directly
contributed to cause his own injury in undertaking to
ride on the car which he knew to be a crippled car,
and in swinging himself down over the side of the car
without looking down to see whether there was a ladder
there or not, and in remaining in the position that he
was occupying at the time of his injury with his back

towards the bridge, and his left leg hanging over the side of it when he knew that the car was crippled, and as he stated, he was afraid the car might run off of the track because of its crippled condition.  (3) The demurrer to the evidence should have been sustained because plaintiff assumed the risk of injury resulting from riding on such a car, he having full knowledge of its condition.  Brown v. Railroad, 59 Kan. 70; Yeaton v. Railroad, 135 Mass. 418; Flannagan v. Railroad, 50 Wis. 462; McClosker v. Railroad, 84 N. Y. 74; Arnold v. Railroad, 125 N. Y. 15; Railroad v. Hennessey, 96 Fed. 713; Railroad v. Ward, 61 Ill. 130; Fraker v. Railroad, 32 Minn. 54; Watson v. Railroad, 58 Tex. 434; Kelley v. Railroad, 35 Minn. 490; Railroad v. Mayo, 14 Tex. Civ. App. 253.

*Bishop & Cobbs* and *A. R. Taylor* for respondent.

(1) The rule of law is that where a master provides a servant an appliance for the work of his employment, the servant may use it, relying upon the assurance that it is reasonably fit and safe to work with in such employment.  And unless the appliance is so defective and dangerous that a reasonably prudent person in the same circumstances would not use the appliance, he is not negligent in using it, as a matter of law, in doing the work of his employment.  Hamilton v. Mining Co., 108 Mo. 376; Swadley v. Railroad, 118 Mo. 278; Pauck v. Beef Co., 159 Mo. 478; Cole v. Railroad, 183 Mo. 90.  (2)  Plaintiff swears that in the course of his duty he wouldn't and couldn't tell that the car leaned, so that it might collide with the post. This condition of the record annihilates appellant's contention.  Appellant cannot find plaintiff negligent unless he assumes that he knew that the condition of the car was such that he couldn't safely undertake to descend from it in the usual way to do his duty. Counsel has no just ground for such assumption, and

for these reasons: 1st. Plaintiff swears he did not
know and in the discharge of his duties wouldn't know
that the car was in a condition that would make it
collide with the bridge post; that it was the duty of
the foreman, Hugg, to know this fact. Nobody dis-
putes this evidence. 2d. When Hugg, as vice-princi-
pal, directed the crew to take the car in question to
the yard in question, it was an assurance from the
master, without more, that the car could be so taken
by the usual and ordinary method, and with safety to
the employees whilst doing so. Sullivan v. Railroad,
107 Mo. 78; Bane v. Irwin, 172 Mo. 316. If plaintiff
did not know of this danger, how can a court declare
in the face of a finding by the jury to the contrary
that he was guilty of negligence in not knowing of the
danger? (3) The servant cannot assume a risk which
arises by reason of the negligence of the master. Blan-
ton v. Dold, 109 Mo. 75; Settle v. Railroad, 127 Mo. 343;
Pauck v. Dressed Beef Co., 159 Mo. 477; Cole v. Rail-
road, 183 Mo. 90; Butz v. Murch Bro., 199 Mo. 286.

GRAVES, J.—Plaintiff instituted action in the
circuit court of the city of St. Louis against the de-
fendant, the purpose of which was to recover damages
for personal injuries. By change of venue, the case
went to St. Charles county, whereupon a trial, without
evidence upon behalf of defendant, was had; the plain-
tiff obtained judgment for $5,000, from which defend-
ant appeals. The defendant having stood upon its de-
murrer to the testimony, and that being practically the
only question urged here, a full statement of the case
is thereby required. The petition charges negligence as
follows:

"That on the 24th day of November, 1902, plaintiff
was, and for more than a year prior thereto had been,
in the employ of defendant as switchman; that at said
time one Francis J. Hugg was a conductor in the em-

ploy of defendant and authorized and empowered to direct and control plaintiff in and about his said work as a switchman; that as a part of his duties as a switchman plaintiff was required to couple and uncouple engines and cars, to attend to the switching or changing of location of the same from place to place, and to ride upon the front car when two or more cars were being pushed from place to place in defendant's yards. That on said 24th day of November, 1902, under the orders, directions and control of the said conductor, Hugg, plaintiff was attending to the switching of a car in defendant's yards which was being pushed by one of defendant's engines; that said car was out of repair and in a dangerous condition and was not in place or plumb on the tracks, as was well known at the time to said conductor, Hugg; that by the direction of said conductor, Hugg, and as was required of him by the rules of defendant, plaintiff placed himself upon the top of said car while the same was being pushed from place to place in defendant's yards; that by reason of the negligence and carelessness of defendant's servants in charge of, and under the direction and control of said conductor, Hugg, said car was pushed into and against and caused to collide with a post or a bridge which crossed defendant's yards at Twelfth street, in the city of St. Louis; that by reason of said collision, caused by the negligence and carelessness of defendant's servants as aforesaid, plaintiff was caught between said car and said bridge post; that by reason of being so caught his left leg was so mashed, bruised and lacerated and the bones thereof so mashed and broken as to require the same to be amputated near the thigh; that the heel of his right foot was so mashed, bruised and lacerated and the bones thereof so mashed and broken as to require the same to be amputated; that the leader of his right foot was severed so as to

207 Sup.—20

cause the entire loss of the use of the same; that his left arm was severely bruised and lacerated and that plaintiff was greatly bruised upon his body.

"Plaintiff avers that said injuries were caused by the negligence and carelessness of defendant and by reason of said defective condition of said car and in requiring him to ride upon said car while it was in said dangerous condition, and the negligence and carelessness of said conductor, Hugg, in ordering him upon said car while it was in said dangerous condition, and by reason of the negligence and carelessness of defendant's servants in causing said car to collide with said bridge post in the manner above stated, and by reason of the carelessness and negligence of defendant in placing the track of the switch, on which the said car was being moved, so close to said bridge post as to make said collision possible."

We quote fully from the petition and answer in view of what is to follow in the undisputed evidence. The answer is:

"For answer to plaintiff's amended petition, defendant denies each and every allegation therein contained.

"Further answering, this defendant says, that whatever injuries the plaintiff sustained on the occasion complained of, if any, were caused by his own negligence directly contributing thereto in this, to-wit: that on the occasion complained of in plaintiff's amended petition plaintiff negligently undertook to ride on a car which plaintiff knew, or by the exercise of ordinary care would have known, was in bad repair and in a dangerous condition, so that it was not safe for any one to ride upon; and while plaintiff was so negligently riding upon said car he negligently placed himself in such a position on said car that he could not pass the pier of the bridge in defendant's yard; and while plaintiff was so on said car he negligently

Hager v. Terminal R. R. Assn.

failed to use ordinary care 'to observe his surroundings and to watch for said pier of said bridge, and negligently failed to use ordinary care for his own safety.

"Further answering, defendant says that the dangers incident to riding upon said car as plaintiff was doing were open and obvious, and by continuing to so ride upon said car plaintiff assumed the risk of injuries incident thereto."

By the evidence, it appears that the defendant, whilst a railroad corporation, is really engaged in the duty of switching cars. Cars, loaded and unloaded, good and defective, are brought into the city of St. Louis, by the railway companies centering there. It would appear that each company had a place or switch where it delivers the cars coming in over its line. These cars are then taken, whether in good or bad condition, and delivered by the defendant to various places upon its line. If the cars are defective they are either returned to the company bringing them in, or are taken to certain points for repair. In other words, one of the duties of defendant, and its divers switching crews, is to handle defective and disabled cars, and to that end the cars to be handled are examined and labeled with cards. These cards are conspicuously posted and indicate the defective condition of the car, so that a switchman handling the car can, by examination of the card, know the condition of the car. Plaintiff in this case was one of a switching crew of five, including the engineer and fireman. One Hugg seems to have been the foreman of the crew, but so far as actual work was concerned, did about what plaintiff did. Plaintiff was riding on what he knew to be a car out of repair, a "bad order" car, to use the expression of the craft, and having in view the "chocking" of the car at a certain point he undertook to alight therefrom by swinging off from the side, and in doing so his leg and foot

were caught between the leaning car (for it evidently leaned to one side) and an upright pier or part of a bridge. The conditions and plaintiff's knowledge thereof are best described in his own language:

"Q. Mr. Hager, I understand you to say you had been working for the Terminal Railroad Association in St. Louis about eighteen months? A. Something like that; I would not be sure, exactly.

"Q. Had you been on the day crew or night crew? A. I had been on both; part of the time one and part of the time another.

"Q. So you had frequently run over these yards with a freight train? A. Yes, sir.

"Q. The train you were handling was made up of an engine and several freight cars? A. Yes, sir.

"Q. Five or six or seven? A. I don't remember the number, about that.

"Q. You think not less than five nor more than seven, about that? A. About that, something.

"Q. You first found this crippled car about Twenty-fourth street, did you say? A. What we call the Twenty-third Street Yard, where the Frisco delivers to the Terminal.

"Q. It was a car that had just come over the Frisco road, was it? A. I couldn't say whether that or some other road threw it over there, but it was on those tracks.

"Q. It was on the Frisco Railroad tracks? A. Yes, sir.

"Q. What, if anything, first attracted your attention to the fact that that car was out of order? A. Bad order card.

"Q. Where did you see that bad order card? A. Tacked on the car.

"Q. Describe the bad order card to us. A. It's a red card and had marked on it 'bad order,' and then tells what —

"Q.   It has certain words printed on it and a blank space by the side of that to write the directions on?   A.   Yes, sir.

"Q.   That is to say, it would say, 'This car is in bad order,' or words to that effect, and leave a space there for the inspector to write what the trouble was? A.   Yes, sir.

"Q.   Would there be anything on there to designate where it was to go, whether to the repair track? A.   The orders would tell that; it would be marked for Sixteenth street or send back to Frisco.

"Q.   The foreman has that?   A.   Yes, sir.

"Q.   The bad order card you speak of was a card in size and appearance similar to the one I hold in my hand, was it?   A.   Yes, sir.

"Q.   And had printed on it in big black letters up near the top the words 'bad order,' is that so?   A. Yes, sir.

"Q.   Then below were the words 'car number,' and a place for the number to be written in, wasn't it? A.   Yes, sir.

"Q.   And then a place for the initials with the word 'initial' there and a blank following?   A.   Yes, sir.

"Q.   And the word 'date' and a place to write the date in?   A.   Yes, sir.

"Q.   And then below were these words, 'Send this car to,' then there was a blank line there, and the words, 'repair track' were printed after it, wasn't they? A.   Yes, sir.

"Q.   And on that blank line they would write whether Sixteenth street or where?   A.   Sixteenth street or send back to   Frisco.

"Q.   Then below were printed the words, 'For the following repairs,' were they not?   A.   Yes, sir.

"Q.   And then following two or three blank lines on which the inspector would write what was neces-

sary to be done on the car, is that correct? A. Yes, sir.

"Q. Then below were the words 'chargeable to,' and a place left blank to state whether one railroad company or another railroad company, whoever the owner of the car was? A. I couldn't tell you about that.

"Q. Well, that's immaterial, but it was just about such a card as this I hold in my hand? A. Yes, sir. I think it was one similar to that; the looks and everything is the same.

"Q. Now, on that bad order card was a statement the car was off center, wasn't it, do you remember that? A. I didn't read the card.

"Q. You didn't read the card? A. No, sir, I was going back past it; the foreman does all that kind of work, looks over the train and everything and marks the cards where they go and everything; he does that from the switch list.

"Q. You saw the red card tacked on there? A. Yes, sir.

"Q. You knew as soon as you saw it that the car was in bad order? A. Yes, sir.

"Q. Now, you passed the full length of the car on the ground, did you, before coupling on to it? A. Yes, sir.

"Q. Who made the coupling, did you when you first picked up the car? A. No, the man following the engine made the coupling.

"Q. What part of the train was it put into at that time, at the end or in the middle or near the engine when you first picked it up? A. Why, it was next to the engine.

"Q. And did the engine go forward or backward with it then? A. Backward.

"Q. And went down to what point before it stopped and changed? A. Twenty-first street.

"Q.   Then who uncoupled it and made the change?
A.  I don't know; I think probably it was Hugg; I won't
say for sure I know that, I don't.

"Q.   Where was the car when you first discovered
the bad order card; was that before you picked it up
at all you saw the bad order card?   A.   Yes, sir, that's
when it was at the  Frisco yards.

"Q.   At the  Frisco yards?   A.   Yes, sir.

"Q.   Then when you discovered it was in bad order
and passed along by it you could see it was leaning
to one side, couldn't you, Mr. Hager?   A.   Well, you
couldn't without just getting down and looking right
point blank at it; you couldn't notice enough to tell
whether it was leaning or not; you could tell it was off
the center, but whether to one side or the other, you
couldn't tell that.

"Q.   We are none of us railroad men here.   Ex-
plain what you mean by being off center; tell the jurors
how does a car look and what's the matter with it when
it's off center?   A.   The truck sets right in there, a
pin goes down the center of the truck.

"Q.   That's about the center of the car?   A.   Yes,
sir, and this pin goes down through the body of the
car and just fits down into the truck underneath to
let the truck turn and still let the body of the car not
turn with it, you know; something on the style of a
wagon, just to turn around, so as to let the bed of
the wagon turn, you know?

"Q.   Somewhat similar to the king bolt of a wa-
gon?   A.   Yes, sir.

"Q.   When you say off center you mean that pin
is out of place or broken or bent?   A.   It's generally
knocked out; when we call off the center it's clear
out.

"Q.   You did'nt notice in this case whether the
pin was simply bent or clear out?   A.   No, sir.

"Q. You could see it was off center, couldn't you? A. Yes, sir.

"Q. When you say it was off center, what was there that revealed to your eye the facts from which you concluded it was off center? A. The trucks were setting back a little too far.

"Q. And the car itself was leaning somewhat? A. Not that I noticed any, no, sir.

"Q. Well, you have handled cars before that were off center? A. Yes, sir.

"Q. And isn't it a fact that a car that is off center is almost sure to lean when you run the train? A. Well, no, not all the time, it may be off center and I have hauled cars a mile or two off center and didn't lean any.

"Q. But it's a matter of frequent occurrence they do lean when off center? A. I never noticed that it was, I wouldn't say it was.

"Q. When they are off center you can't tell just what they are liable to do when they are off center; that is to say, they may remain straight or lean to one side or may drop at one end? A. It's liable to drop at one end; I never saw a car lean, though.

"Q. Never saw one lean before? A. No, sir.

"Q. You have handled a good many cars that were off center? A. Yes, I expect I have handled a dozen or two of them at different times.

"Q. You say you took the car up at Twenty-third street and carried it down to Sixteenth or where when you made that change? A. Twenty-first street.

"Q. There you made the change and put the car at the east end of the train furtherest from the engine? A. Yes, sir.

"Q. Did Mr. Hugg explain to you at the time why he did that? A. He didn't say anything about it at all why he done it.

"Q. Did you know why it was done? A. I know, yes.

"Q. Why was it? A. He done it so it would be the next car to pick up when we went around and he wanted to shove it to the Sixteenth street repair-shop.

"Q. Your idea was to go to Twelfth street and stop and cut the engine loose and come back on another track and run around it? A. Yes, sir.

"Q. And switch over and couple on the east end? A. Yes, sir.

"Q. And then go down to the Sixteenth street repair-track and there drop it for repairs, that was the idea, wasn't it? A. Yes, sir.

"Q. You knew that? A. Yes, sir.

"Q. You knew it then, didn't you; you knew that was what was going to be done; you understood that? A. Yes, sir.

"Q. Now, this car that you got upon was a stock car, wasn't it, this defective car? A. Yes.

"Q. Where were you in the yards when you first got on to that car; was it after that change had been made you got on it? A. Yes, at Twenty-first street.

"Q. You and Hugg both got on it? A. Both got on it, yes, sir.

"Q. Had you previously ridden on one of the other cars when you picked that up at Twenty-third street; you didn't get on the car, did you, when you first picked the car up; you didn't get on that crippled car, did you, you and Hugg? A. I did after a while, yes; Hugg, I think, was on the front end of the engine or the end of the engine.

"Q. And you got on the crippled car when you first picked it up at Twenty-third street, did you? A. I was on it for a while, yes, sir.

"Q. And you got off because you noticed the car was in a crippled condition and didn't feel secure in

riding on it, wasn't that correct? A. I was afraid it might accidentally run off the track, yes, sir.

"Q. Because it was off center, that was the reason, wasn't it? A. Yes, marked bad order.

"Q. Marked bad order? A. Yes, sir.

"Q. And you knew it was off center? A. Yes, sir.

"Q. And you were afraid some accident might happen and therefore you got off it, didn't you—you said so a moment ago? A. At Twenty-first street?

"Q. Yes. A. Yes, sir.

"Q. Then where were you when you got back on to the car? A. Well, I couldn't tell you just the exact place; it was somewhere near Fourteenth street; I wouldn't say whether above or below.

"Q. Did you climb up on it from the ground or step over from another car? A. Stepped from another car.

"Q. It was then the car furtherest east, wasn't it? A. Yes, sir.

"Q. And immediately before you stepped on it you had been riding on the car just west of it, hadn't you? A. Yes, sir, the next car west.

"Q. Where were you when you got on that car immediately west of the crippled car; whereabouts did you climb up on to that car? A. Why, I was on the main track.

"Q. About what street? A. Somewhere near the vicinity of the power house there.

"Q. How far is that from Fourteenth street; how many streets from Fourteenth street, several blocks? A. Let's see, four or five.

"Q. Four or five blocks, so that for four or five blocks you and Hugg both rode on the car immediately west of the crippled car? A. Yes, sir.

"Q. And then when you got to about Fourteenth

street you stepped over on to the crippled car and walked the length of it, did you? A. Yes, sir.

"Q. And started to climb down this ladder? A. I didn't start to climb down until after we were shoved pretty well down in the yards.

"Q. You got in fifty, seventy-five or a hundred feet of the pier of the bridge when you started down? A. Yes, sir.

"Q. You knew at the time, and knew all the time, this was a stock car, did you not? You noticed that when you picked it up? A. Yes, sir.

"Q. And stock cars have slats on the sides of them, haven't they? A. Yes, sir.

"Q. And spaces between the slats so as to let the cattle have air? A. Yes, sir.

"Q. And all stock cars are built that way, aren't they? A. Yes, sir.

"Q. Well, now, had you ever handled any of this same series of cars before this, Swift Live Stock cars? A. I suppose I have, but I never paid particular attention to that; I handled all kinds of cars.

"Q. And you had frequently seen cars before, as I understand you, where the top or roof hand-grab or hand-hold was parallel to the side of the car and the ladder was on the end of the car; you had seen that before? A. Yes, sir.

"Q. You had frequently seen that? A. Yes, sir; I don't think there is any railroad man but what had.

"Q. And you had been misled that way before, hadn't you, swung down and found no ladder on the side and then switched to the end? A. Once or twice before, yes, sir.

"Q. And you think that's a matter of common experience to railroad switchmen? A. I don't know; it happened to me a couple of times before.

"Q. Now, when you started down the side of that car you didn't look down to see whether a ladder was

there or not before starting down, did you? A. No, sir; I put my foot over and let it go.

"Q. Took hold of the hand-grab of the roof and swung down, is that correct? A. Yes, sir.

"Q. Isn't it a fact that they never build stock cars with the ladders on the side, so far as your observation has gone? A. Oh, no; stock cars have side ladders.

"Q. Isn't it a fact they are always on the end because of these slats there? A. Oh, no; stock cars have side ladders."

One cannot read this evidence without concluding (1) that the duty of the defendant and its employees was to remove and transfer cars, whether said cars were in good or bad repair, (2) if such cars were in bad condition that such cars were either returned to the railroad company bringing in the same, or taken to a place for repairs, (3) that cars, if defective, were labeled with cards, indicating the defects, (4) that the car upon which plaintiff was riding when injured was defective, and was marked as defective, and known to be defective by the plaintiff, (5) that its condition was not only known to plaintiff, but that it was such that, for a portion of the trip, he did not and would not ride upon it, (6) that Hugg, the alleged conductor, and by way of argument, vice-principal, did not and would not ride upon it, (7) that the plaintiff had and possessed all of the knowledge which the master possessed as to this particular car, and the dangers incident to the handling thereof, (8) that the plaintiff knew and understood that defective cars, of different and divers kinds, had to be handled by the defendant in the course of its business. Now, with these conceded facts, should there be liability in this case? It becomes not so much a question of law, as it is the application of the law. We have here a servant, who by reason of his employment, was to handle defective as well as sound cars.

We have here a master who has performed the full measure of his duty, by marking, in plain terms, the condition of the car. We have here a servant who admits that he knew the condition of the car. The question is whether a servant, who by reason of his employment is required to handle both defective and sound cars and is (admittedly) advised of the condition of the car being handled, can recover? We think not. If there was danger in this particular car, the servant was as fully advised as was the master. In handling cars of this character he, as well as the master, understood that such, in the business performed by the master, had to be handled. The servant, a man of experience, knew the dangers of his employment, and had personal knowledge of the apparent dangers accompanying the handling of this particular car. If the car had been run in upon him without knowledge of its condition, the case might be different. But here we have an admitted knowledge of the condition. Plaintiff knew that the car was "off center," and by his experience must have known the dangers incident to the handling thereof. Knowing that the master was bound to handle defective cars, he was obligated to look out for such cars. But not placing this opinion upon that ground, the plaintiff in this case was fully advised as to the character of the car which he was handling, at least as much so as the master, and under no theory of the law can he recover. Giving to plaintiff the broadest theory to which he is entitled, we can discover no legal principle under which his case should have been submitted to the jury. Accident and consequent injury do not authorize a verdict. Under the evidence of this case it was the plain duty of the trial court to have directed a verdict for the defendant. The case will therefore be reversed and remanded with directions to enter judgment for defendant.

All concur.