MARY FLACK, Administratrix of Estate of S. C. FLACK, v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.

Division Two, December 1, 1920.

1. **ABSTRACT:** Filing of Motion and Signing of Bill. If the abstract states that the motion for a new trial and the bill of exceptions were duly filed, and objection that the abstract fails to show that the motion was filed in term time. and within four days of the rendition of the verdict, and that it does not show that the bill was signed by the trial judge and properly signed, will, according to Rule 31, be overruled, unless the respondent produces the record showing that the recitals' in the abstract that the motion and bill were duly filed are untrue.

2. **NEGLIGENCE:** Demurrer to Evidence: Consideration of Defendant's. Where the evidence tending to support plaintiff's case is vague and unsatisfactory, the court, in considering a demurrer to the evidence, may consider, not only the evidence offered by. plaintiff's, but, under appropriate conditions the evidence of the defendant.

3. ———: ———: Tightening Wash-Out Plug in Boiler: Rule of Company. Where the wash-out plug of a locomotive engine carrying from 190 to 200 pounds of steam was discovered to be leaking, and the foreman of the crew whose duty it was to repair it before it was sent out on the road was an experienced worker, was warned by one of his subordinates that it was dangerous to attempt to . tighten the plug without first blowing off the steam, it was in open violation of the company's rule to undertake to tighten the plug while the boiler was full of steam, the foreman knew of the rule, had been warned that he would be discharged if found violating it, had been specifically instructed that the proper method of tightening or renewing the plug was to first blow off the steam, had manifested a disposition to disregard the rule, had boasted of his ability and willingness to undertake to make such repairs in defiance of the rule and in contempt of the danger involved, it was besides manifestly dangerous to undertake to tighten the wash-out plug while the boiler was full of steam, and he nevertheless without blowing off the steam undertook to tighten the plug, it blew out and the escaping steam caused his

Flack v. A. T. & Santa Fe Ry. Co.

death, there can be no recovery of damages for his death, not withstanding the subordinate who warned the foreman of the danger testified that the foreman at the time said he had instructions from the company to tighten wash-out plugs with the steam on and without blowing down the engine. Under such circumstances there can be no recovery even under the Federal Employers Liability Act.

4. ———: ———: **Under Federal Act.** Where the conclusion from the evidence is inescapable that the death of the foreman was due to his own negligence, there can be no recovery under the Federal Employers Liability Act.

5. ———: **Assumption of Risk.** The servant assumes those risks which are necessarily incident to the work in which he is employed. Where the foreman was in charge of the work of repairing defects in the railroad company's engines and boilers, the particular boiler which he undertook to repair was obviously defective, and he possessed all the knowledge which the company possessed concerning the particular boiler and concerning the dangers incident to handling it, he assumed whatever dangers were naturally and ordinarily incident to the necessary repair of such defect.

6. ———: ———: **Under Federal Act.** Except in cases in which there has been a violation by the employer of the provisions of the Safety Appliance Act, the defense of assumption of risk is a valid defense to an action brought under the Federal Employers Liability Act.

7. ———: **Belated Grounds for Affirmance.** A contention brought forward by respondent in a "memorandum of additional authorities," filed since the cause was originally argued, that the judgment for plaintiff should be affirmed because the case shows a violation of the Federal Boiler Inspection Act, may well be disregarded where it is brought forward after the case, on appeal, has been briefed, argued and submitted, and it was not tried on that theory in the trial court.

8. ———: ———: **Federal Boiler Inspection Act.** The Federal Boiler Inspection Act prohibits the use of any locomotive engine in interstate traffic unless its boiler is in proper condition and safe for operation "in the active service of moving traffic", and does not apply to an engine which is being prepared and made safe for use in such traffic.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

REVERSED.

*Cyrus Crane, Geo. J. Mersereau, John H. Lathrop,* for appellant; *Thomas R. Morrow* of counsel.

(1) The case falls within the purview of the Federal Employers' Act of April 22, 1908 (35 U. S. Stat., p. 65, c. 149), as amended by the Act of April 5, 1910 (36 U. S. Stat., p. 291, c. 143). Seaboard Air Line Ry. v. Horton, 233 U. S. 501; Railroad v. Slavin, 236 U. S. 454; Southern Ry. Co. v. Gray, 241 U. S. 338. (2) On the entire record plaintiff was not entitled to recover. (a) Because the accident and death of S. C. Flack, deceased, was due solely to his negligence and his negligence was the sole proximate cause of said accident. Great Northern Ry. Co. v. Wiles, 240 U. S. 444; Scoffin v. Furniture Co., 184 Mo. App. 627; Finnegan v. Ry. Co., 244 Mo. 608. (b) Because S. C. Flack, deceased, assumed the risk flowing from the manner and way in which he attempted to do the work. Seaboard Air Line v. Horton, 233 U. S. 492; Boldt v. Pa. Railroad Co., 245 U. S. 441; Gila Valley Ry. Co. v. Hall, 232 U. S. 94; Jacobs v. Southern Ry. Co., 241 U. S. 229; Gillis v. Railroad Co., 249 U. S. 515; Hatton v. Railroad Co., 261 Fed. 667; C. R. I. & P. Ry. Co. v. Ward, (U. S. Sup. Ct., March 1, 1920); 1 Bailey on Personal Injuries, Re Master & Servant, sec. 504 and sec. 505; 14 Am. & Eng. Encyc. Law (1 Ed.), 845; 20 Am. & Eng. Encyc. Law (2 Ed.), 118; Elliott on Railroads, 1289, p. 708; Hager v. Railroad, 207 Mo. 317; Bradley v. Ry. Co., 138 Mo. 302; Jackson v. Ry. Co., 104 Mo. 457; Purcell v. Tennent Shoe Co., 187 Mo. 276; Armour v. Hahn, 111 U. S. 313; Roberts v. Tel. Co., 166 Mo. 370; Henson v. Armour Pkg. Co., 113 Mo. App. 618; American Bridge Co. v. Seeds, 144 Fed. 605; Cole v. Sav. & Loan Soc., 59 C. C. A. 593, 124 Fed. 113, 63 L. R. A. 416. (3) The evidence of custom and practice was erroneously admitted, and the court further erred in refusing to withdraw such evidence from the consideration of the jury. Shields v. Ry. Co., 87 Mo. App. 643; Ry. Co. v. Lindeman, 143 Fed. 946.

*Atwood, Wickersham, Hill & Popham* for respondent.

(1) Appellant's abbreviated abstract of the record is fatally defective because it fails to show that motion for new trial was filed in term time and within four days of the rendition of verdict. The only reference to a motion for new trial is on page nine of appellant's abstract of record and this wholly fails to meet the requirements of the law and rules of the court. Also there is no showing that bill of exceptions was signed by the trial judge and properly filed. McKnight v. Hagemeier, 209 S. W. 904; Frick v. Natl. Ins. Co., 213 S. W. 854; State ex inf. v. Morgan, 268 Mo. 270. (2) It must be conceded that the washout plug was negligently and carelessly inserted in the boiler by the Italian and Russian boiler workers. The negligence was the negligence of defendant. In Missouri it is well settled that assumption of risk is no defense where the defendant is negligent. This is so even in cases involving the application of the Federal Employers' Liability Act. Fish v. Railroad, 263 Mo. 106; Holloway v. Railroad, 276 Mo. 490. (a) Under the holdings of the Federal court, even if they vary slightly from our courts on the question of assumption of risk, the question, if any, of assumption of risk was properly left to the jury and the jury was correctly instructed on this issue by the court on the request of both plaintiff and defendant. Erie Railroad Co. v. Purucker, 244 U. S. 322, 61 L. Ed. 1166; Union Pac. v. Hadley, 246 U. S. 330, 62 L. Ed. 751; Ry. Co. v. Brown, 229 U. S. 317, 57 L. Ed. 1204; Ry. Co. v. Proffitt, 241 U. S. 62; Pac. Railroad Co. v. Cole, 214 Fed. 950; Ry. Co. v. Earnest, 229 U. S. 122, 57 L. Ed. 1096; Seaboard Air Line v. Horton, 233 U. S. 492; Schlemmer v. Railroad, 205 U. S. 11, 43 L. Ed. 686; Ill. Cent. Railroad v. Skaggs, 240 U. S. 66, 60 L. Ed. 528; Ry. Co. v. De Atley, 241 U. S. 315; Anzolotti v. McAdow, 262 Fed. 569; Patnum v. Railroad, 259 Mo. 120. (b) Failure of an employee to follow rules raises only a question of

contributory negligence. Ill. Cent. Railroad v. Stewart, 223 Fed. 32; M. K. & T. Railroad v. Hawley, 123 S. W. 726; Thornboro v. Railroad, 91 Kan. 684, 139 Pac. 410.. (3) It was a question for the jury whether the method used by Flack was safe or unsafe. And witnesses were competent to testify about the custom of doing the work. Diettrich v. Am. Mfg. Co., 190 S. W. 1009;· Boehn v. Elec. Co., 170 Mo. App. 671; Rhea v. Railroad, 171 Mo. App. 171; Ry. Co. v. Brown, 229 U. S. 317, 57 L. Ed. 1204; Wolf v. Scullin Steel Co., 217 S. W. 573;· Hutchinson v. Safety Gate Co., 247 Mo. 116; Fleming v. Mining Co., 186 S. W. 1117. (4) Appellant's alleged error on the part of court in regard to improper arguments is without merit. The objectionable remarks were withdrawn by counsel in the presence of the jury. It was a matter rightfully within the discretion of the trial judge to control and such discretion was not abused. Norris v. Ry. Co., 239 Mo. 721;· Dutcher v. Railroad, 241 Mo. 177.

WILLIAMSON, J.—This is a suit in damages on the part of Mary Flack, administratrix of the estate of S. C. Flack, deceased, against the Atchison, Topeka & Santa Fe Railway Company. The suit is brought under the provisions of the Federal Employers Liability Act. After formal allegations, the plaintiff alleges "that about 5.45 a. m., September 1, 1915, decedent's attention was called by one of defendant's employees to the fact that steam was leaking from around a wash-out plug on the boiler of an engine which was being put in readiness for use; *that when an attempt was made to tighten said wash-out plug, the same blew out and decedent was covered by steam and hot water issuing from said boiler, burning and scalding decedent to such an extent that as a result thereof he died within a few hours thereafter* . . . Plaintiff alleges that the defendant, its agents, servants and employees, were careless and negligent in the following particulars, to-wit: *That the defendant's agents, servants and employees, other than decedent, negligently*

*and carelessly inserted the wash-out plug in such a manner as to cause the said steam and hot water to leak out around the same and blow out as aforesaid, and negligently and carelessly failed and omitted to inspect said wash-out plug when same was put in place, and to see that the same fitted properly and was tight and would not leak;* and that, as a direct result of said negligence and careless acts and omissions on the part of defendants, its servants and agents and employees, said water plug blew out and decedent received his mortal injuries.''

Further allegations are to the effect that the locomotive in question was designed for use in interstate commerce, and that the plaintiff was the wife of the deceased; that he left five children, all of tender years, and that decedent at the time of his death was 38 years of age and earning $130 per month.

The answer contained a general denial, a plea that the death of the decedent was caused by his own negligence, and the following paragraph:

"Further answering said first count of said petition, defendant states that at the time and place when deceased, S. C. Flack, was employed on or about September 1, 1915, there was in force and effect a rule of the defendant company governing and controlling the actions of said S. C. Flack, deceased, as follows:

" '17. In case wash-out plugs are found to be loose after pressure is on the boiler, steam pressure must be reduced until there is no danger of plug blowing out while attempting to tighten it.'

"That S. C. Flack had full notice and knowledge of said rule, but in violation of same at the time and place mentioned in plaintiff's petition negligently failed to reduce the steam pressure upon the boiler of the engine in question and by reason thereof said plug blew out, causing the death of deceased, so that by reason of said negligence in the violation of said rule, plaintiff is not entitled to recover.''

The answer further contained, in paragraph six, allegations concerning other instructions alleged to have been given in accordance with the rule above pleaded, and in paragraph seven a plea of assumption of risk. The reply was a general denial of the allegations of the answer, coupled with a further plea to the effect that Rule 17 above mentioned had been waived by defendant, and that the customary and usual method of the defendant in reference to the matters referred to in the rule was to disregard rather than to enforce the rule. At the close of the evidence, the plaintiff elected to stand on the count from which we have quoted the salient portions.

The evidence for the plaintiff in substance showed the appointment and qualification of the plaintiff as administratrix; the death of the decedent; that he had been for about eight years immediately prior to his death in the employ of defendant, at Argentine, Kansas; that the number of the children was as stated in the petition; that the deceased was thirty-seven years of age, and was earning $125 per month.

E. W. Martin, for the plaintiff, testified that the deceased was a boiler-maker and was in charge of a gang of men whose duty it was to wash out the engine boilers, and to make such repairs as could be made in the yards, without taking the engine to the shops, to overhaul the engines and prepare them for service on the road, and steam them up and get them ready to go out; that witness was a boiler-maker and a member of the crew of which Flack was foreman; that on the morning of September 1, 1915, between four and five o'clock, Engine No. 1489 was being prepared to go on an interstate trip. The engine was then about ready to leave the round-house in Argentine, Kansas, preparatory to cross ing to Kansas City, Missouri, where it would be attached to the train and proceed thence to points in Kansas and Oklahoma. There was about 190 to 200 pounds of steam up in the boiler immediately before the accident occur-

red.   In various places about the boiler there are "wash-out plugs."   These plugs are devices which are built into the boiler for the purpose of being used in cleansing it, and consist of copper bolts about 3⅜ inches in diameter, which are screwed into the body of the boiler and which, when in place, form a part of the body.   The end of the plug penetrates to the end of the hole, as well as to the other parts of the inside of the boiler.   It was the duty of the decedent to inspect the engines immediately before they left the round-house, and to ascertain whether or not they were in proper condition to be sent out.   On the morning of the day on which the accident occurred, the deceased sent a boiler-maker helper, one Frank Creten, to inspect this and other engines and Creten reported that a wash-out plug underneath and on the left-hand side of the boiler of the engine in question was permitting steam to escape.   Upon learning that this plug was leaking, Flack called this witness, Martin, to assist in stopping the leak.   Martin looked at the leaking plug, and knew that the engine was carrying a pressure of about 200 pounds of steam.   Martin further testified that the plug had been put in improperly, and that he thought it should be tightened up.   He examined the wash-out plug while Mr. Flack was standing nearby.   From the fact that the steam was leaking around the plug, he came to the conclusion that the plug was cross-threaded, that is to say, the threads were cut, or that it was not screwed in completely.   This conversation then occurred between Martin and Flack:

"Q.   What did you say to Flack, if anything, about the plug or about doing the work?   A.   Well, I told him I would not tighten the plug up; to go get the boiler washer and his helper to tighten this plug up.

"Q.   And what did you say to him, if anything, about the danger of the work?   A.   I told him that there was danger to tighten this plug up under the condition of the boiler, and he said to me—he said, 'I had instructions from the company to do this work this way,' and I

said, 'Blow this engine down,' and he says, 'I have instructions to tighten these with the steam on.' "

Martin refused to assist in the work, but sent his helper, one Caldwell, and two boiler-washers, both foreigners, were also called. This witness also testified that if a wash-out plug was not properly inserted, it was liable to blow out, and would not hold the pressure; that he had never seen a boiler "blown down to have the plug tightened on it," nor known of that being done (Blowing down a boiler consists in permitting the steam to escape by devices intended for that purpose); that he had been working about the round-house for about seven months, and had seen leaking plugs tightened up without having the steam pressure reduced.

On cross-examination the witness stated that there was about two hundred pounds of steam in the boiler at that time; that he was a boiler-maker working under Mr. Flack; that one Lyle, who was Flack's immediate superior, was in the round-house that night; that Roy Current was in charge of the round-house, and that Flack was in charge of the boiler-makers at night; that Caldwell, another witness for the plaintiff, was Martin's helper; that the duties of the witness were to discover and repair leaks on engines, to put in flues, build any part of a boiler or patch it, or do anything pertaining to the boiler itself. On the morning in question, he had been at work upon another engine about twenty feet away. Electric lights were burning in the round-house and the workmen had the assistance of an electric light extension in working about that engine, and some torch-lights as well. When Martin told Flack of the existence of the leaking wash-out plug, Flack instructed him to get a wrench and tighten it up, and then the following occurred:

"Q. What did you tell him? A. I told him to get the boiler washers to tighten it that put it in.

"Q. Did you tell him anything else? A. Yes, sir; I told him it was dangerous to tighten that plug up.

"Q. Just go ahead and tell anything else that you told him. A. I told him then I would get a pipe to put on this pipe for the boiler washers. He started after the boiler washers, I guess; I went over and got a plug pipe from 2118, and when I got back the boiler washers were pulling down on the plug.

"Q. And where was Mr. Flack? A. Right between the boiler and the fire-box.

"Q. That was on the left-hand side? A. Yes, sir.

"Q. And these men had the wrench on this plug that you had looked at, had they? A. They had the wrench on the plug then.

"Q. And were pushing down on it or pulling up on it? A. They had pushed down on it from that side.

. . .

"Q. So you told him it was dangerous and told him that you would not do it? A. Something similar to that, yes, sir."

The witness procured the wrench and pipe which he had been instructed to get, and returned to the engine. He testified as to what then occurred, as follows:

"Q. And what was being done when you got there? Was that when the men were tightening the screw? A. They had the wrench on the plug at that time when I got back.

"Q. And were pushing down on it? A. Just started.

"Q. Both of these men or which one of them? A. I could not say whether both of them or one of them, but I think there was two of them on it."

The witness further testified that he told Flack that he (Flack) "ought to blow that engine down before he undertook to fix that plug," and that he did so because he thought it was dangerous to tighten the plug up with the engine under full pressure of steam. He then laid the wrench and pipe down upon the floor and walked away. Very shortly after he left the wash-out plug blew out

and Flack was so severely scalded that he died within a few hours thereafter. Caldwell, another helper, was also seriously injured. Upon further cross-examination, the following testimony was given by this witness:

"Q. What would be the proper way of handling that plug there under the conditions? A. Well, the proper way to handle it would have been against the company's rules, but to blow the engine down.

"Q. Don't you know that that is the only way to do it? A. Yes, sir.

"Q. And the only safe way to do it? A. Yes, sir.

"Q. Is to blow that engine down and reduce the pressure of it, before undertaking handling the plug? A. Yes, sir.

"Q. Now, how do you reduce the pressure on the engine? A. Why, you have got pipes there to let it out into; into another part of the tanks outside of the house.

"Q. On the engine itself, how do you reduce the pressure? A. That is the best way to reduce the pressure of them; up at the dome they have a valve to let the steam off and not let the water out.

"Q. You had something in the dome of the engine to let the steam off? A. Yes, sir.

"Q. And then what is the other way? A. Out of the blow-off cocks.

"Q. How many blow-off cocks are there on the engine. A. Two.

"Q. Was this engine equipped with blow-off cocks? A. Yes, sir.

"Q. Is there any other way of reducing it? A. That is about the only two ways I know to reduce it.

"Q. Do you say that the company had any rules of instruction there that you were not to reduce the pressure of an engine when you were tightening up the plugs, or is that what Flack told you his instructions were? A. Not only from him telling me, but from seeing it from the other foremen on at times; they never blew an engine down.

"Q. You had seen men in that way do it to tighten plugs with the steam up? A. Yes, sir.

"Q. Do you know how much steam was up on the engine? A. Why, I, myself, would tighten them up with about one hundred pounds on them.

"Q. You yourself would tighten them up with about one hundred pounds on the engine? A. Yes, sir.

"Q. But you never did that with a pressure of two hundred or one hundred and ninety, did you? A. No, sir. . . .

"Q. When you have tightened the plugs up you think the pressure was around ninety or one hundred pounds? A. That would not be safe at that, the proper way to do it would be to blow the engine down.

"Q. And that is for the reason that this plug has the same pressure of steam as any other part of the boiler? A. Yes, sir.

"Q. And in order to examine the plug you have got to take it out, haven't you? A. Yes, sir.

"Q. And you cannot take it out until the pressure is reduced? A. No, sir.

"Q. Now, that would be true whether the plug was cross-screwed or whether there was something the matter with it, if it was leaking? A. You mean to take it out?

"Q. Yes, sir. A. Yes, sir."

The witness further testified that he could not say that he had ever seen a wash-out plug tightened in the presence of any foreman without first having the steam pressure reduced. The witness Caldwell also testified that the steam pressure on the engine at the time in question was around two hundred pounds'; that he did not see the workmen attempting to tighten the plug, but would not say that they did not attempt to do so, and that on the trial previously held in his own case, which grew out of the same facts, he had testified that he stood and watched the workmen and that one of them "pro-

ceeded to be doing something in and around one of the plugs there.''

At the conclusion of plaintiff's evidence, the defendant asked an instruction in the nature of a demurrer to plaintiff's case, which was by the court refused. Defendant thereupon introduced evidence which was, in substance, as follows:

E. E. Machovek, master mechanic for the defendant company at Argentine, Kansas, (who had been acting in that capacity for nine years, as round-house foreman, general foreman, and then master mechanic), testified that the nature of Flack's duties was as shown in the evidence of plaintiff, and further, that it was his duty to examine the threads of wash-out plugs, as well as the threads in the boiler in which the wash-out plugs fitted, and to repair any defective threads which he found in either place, and generally to see that the engines were in good condition; that at the time he was killed he held the position of night boiler-maker foreman. The witness identified the book of rules governing steam boilers, testified that Flack as a boiler-maker gang foreman had a copy of the rules, and thereupon the defendant offered in evidence Rule 17, which is as follows:

"In case wash-out plugs are found to be loose after pressure is on the boiler, steam pressure must be reduced until there is no danger of plug blowing out while attempting to tighten it.''

The witness testified that Mr. McGoff, mechanical superintendent, was the witness's immediate superior; that he had received a letter from McGoff concerning the tightening of wash-out plugs; that this letter, in substance, contained a direction that "when plugs are leaking, when pressure is on the engine, they must not be tightened up.'' Thereafter, the witness, under date of November 24, 1914, issued written instructions in compliance with this letter from McGoff; that after Flack was appointed foreman the witness instructed him and

all foremen under his charge that any foreman who tried to tighten wash-out plugs while under pressure would be dismissed from service; that no instructions to the contrary were ever issued, and that it was the duty of Flack as boiler-maker gang foreman to see that these rules were enforced and that the men under his control lived up to them; that as far as he knew the men complied with these rules; that so far as he knew wash-out plugs were not tightened up under pressure prior to the death of Mr. Flack; that one of the boiler washers who had been working on the engine at the time Mr. Flack was killed was at the time of the trial "in the old country somewhere;" that the other, named Gorhand, was then in the court-room; that it was the duty of Mr. Flack to follow up the boiler washers and ascertain the condition of the engines; that there was no other inspector charged with that duty. Neither party used Gorhand as a witness.

Other witnesses for the defendant testified in substance as follows:

James Doran testified that he was boiler foreman for the defendant company, at Argentine, Kansas, and had occupied that position for about eighteen years; that his duties related to looking after everything pertaining to boiler work; that he knew the decedent, who was a boiler-maker gang foreman under the witness; that deceased was a regular night gang foreman over the boiler-makers; that his duties were to supervise the work and see that the work that was required by the engineers was done, as well as any other boiler work that was found to be necessary, "to give each boiler washer gang its engine to wash and see that it was washed thoroughly and that all plugs were put back; . . . in other words, it was part of his duty to see that the engine was in proper shape before it went out on the run, so far as boiler work was concerned; he was the head of that department;" that Rule 17 was in force on September 1, 1915, and prior to that time; that Mr. Flack had

a copy of that book, and the witness produced a receipt bearing Mr. Flack's signature showing the receipt by him of a book containing Rule 17, the receipt being dated February 20, 1915. The witness further testified that he received the letter mentioned in the testimony of Mr. Machovek concerning tightening boiler plugs; that he thereupon called Mr. Flack in and had a talk with him about it, and showed the letter to Mr. Flack and to all the other gang foremen; that Flack had been a gang foreman for about two years; that witness instructed Flack not to tighten up wash-out plugs with the pressure on; that the pressure should be reduced, the engine should be blown off and then the plug should be tightened or taken out and the nature of the trouble should be then ascertained, and that he had never given Mr. Flack any instructions to the contrary. On cross-examination, the witness testified that if wash-out plugs were ever tightened without the steam being released he did not know anything about it. On re-direct examination, the witness testified that he had seen the steam released before wash-out plugs were tightened, and that that was the way to do that sort of work—that "our regular way is to blow an engine off through the line and get it all out . . . and then do the work and fill it back up again," and that the only safe way was to take all the steam off and then tighten the plug or let the water out.

Charles Lyle testified for the defendant, that at the time of the accident he was night round-house foreman at the Argentine round-house where the accident occurred but he was not working on the night when Mr. Flack was killed; that Fremont Cruse was in charge of the round-house during the witness's absence; that he had known Mr. Flack since 1912, at which time Flack was working for the defendant in the boiler gang and later as extra foreman; that he had seen Flack working on wash-out plugs, and had given him instructions on how to do the work when the engine was under steam; that these instructions were to return the engine to the round-house

and blow the steam off, remove the plug and re-fit it, and again fill up the engine; that a short time before Mr. Flack was killed there was an engine down the line under steam, with a wash-out plug leaking; that the witness and Flack went down to that engine, Flack arriving first; that Flack started to put the wrench on the plug and the witness instructed him not to do that, and they returned the engine to the round-house, blew off the steam and made repairs to the plug with the boiler empty; that he then told Mr. Flack "not to fool with those plugs when the boiler had pressure on, because they would blow out and kill him and somebody else." The witness further testified as follows:

"Q. What did Flack say? A. He said he 'ate those things.'

"Q. What did you say? A. I told him 'he would get one some time that he could not digest.'"

The witness further testified that the proper and safe method of doing this work was to release the steam before repairing the wash-out plug; that the incident above related occurred about two months before Mr. Flack's death; that no custom or practice existed, to the witness's knowledge, among round-house foremen, of tightening plugs when the engine was under steam. On cross-examination, the witness testified that he had never seen a wash-out plug blow out, but that he had told Flack that they would blow out; that in a place as large as the round-house at Argentine was, it could happen that plugs would be screwed in with the engine under steam without the knowledge of the round-house foreman, but that he did not know that it ever had been done.

"Fremont Cruse, a witness for defendant, testified that he was a machinist for the Union Pacific at Junction City at the time of the trial; that on September 1, 1915, he was assistant round-house foreman for the defendant at Argentine, Kansas, and had been serving in that capacity for about eight years; that he never saw any of the employees or any of the foremen tighten up any of

the wash-out plugs that were leaking or loose when the engine was under steam, without reducing the pressure; that the proper method, aside from any rule, was to reduce the pressure to a safe pressure before the work could properly be done, and that a safe pressure meant no pressure.

F. C. Hamilton, another witness for defendant, testified that he was engine foreman of the Santa Fe shop at Argentine, and had held that position for five years; that he had held a similar position at Newton, Kansas, with the Santa Fe since 1906; that he knew Mr. Flack; that as gang foreman Flack was the supervising officer and had charge of the boiler work, boiler washing and the handling of wash-out plugs, and that the men doing that particular work were directly under him; that the master mechanic, Mr. Machovek, called meetings of the foremen regularly once a month, where the rules were discussed; that Mr. Flack was persent at those meetings; that the letter from Mr. McGoff was read at one of these meetings when Mr. Flack was there, and that all of the foremen were then cautioned with reference to tightening up wash-out plugs, and were warned that they would be dismissed by the master mechanic if they were caught tightening up these plugs while the engine was under steam; that in the event an engine was discovered to be leaking when due to go out on a run, it was Mr. Flack's duty to notify the round-house foreman to send out another engine, and to turn in the defective engine for repairs; that in specific instances he had cautioned Mr. Flack against attempting to tighten wash-out plugs when the engine was under steam; that he had known of several occasions when engines were held for repairs and the steam was released before attempting to tighten the wash-out plugs. On cross-examination, the witness testified that a boiler foreman's duties, among other things, included seeing to it that all the rules were complied with; that there were seventy or eighty men under Mr. Flack's supervision, engaged in work upon engines and boilers.

The foregoing is the substance, of all of the evidence offered by the parties.

Upon the conclusion of all the evidence, the defendant asked a peremptory instruction to the jury to find that under the pleadings and the evidence the plaintiff was not entitled to recover, which instruction was refused, and defendant excepted. A verdict was rendered in favor of the plaintiff in the sum of $10,000, and by proper steps an appeal from the judgment entered thereon has been duly lodged in this court.

I. At the inception of our consideration of this case we are confronted with respondent's contention that this appeal should be dismissed on account of the alleged defects in appellant's abstract of the record. The abstract is said to be defective in the following particulars:

Abstract. (a) That it fails to show that the motion for a new trial was filed in term-time and within four days of the rendition of the verdict; (b) that there is no showing that the bill of exceptions was signed by the trial judge and properly filed.

We think that this contention is devoid of merit, for the following reasons: Appellant has filed here a certified copy of the order granting the appeal, and the abstract states that both the motion for a new trial and the bill of exceptions were duly filed. The motion for a new trial is set out at length in the bill of exceptions. Under our Rule 31, this is all that is necessary. If respondent desires to controvert the correctness of this statement, the burden is upon her to produce here the record showing the contrary to be the fact. This she has not done. If the recital in the abstract is correct, the appeal is properly here, and if that recital is not correct, respondent could easily have shown that fact. We rule this point against the respondent.

II. Appellant contends that on the entire record, the respondent was not entitled to recover. Both par-

**No Case.**    ties concede that this is an action under the Federal Employers Liability Act. We have set out the evidence, at tiresome length, perhaps, because of appellant's contention, as above stated.

In considering this question it is well to bear in mind that the allegation of negligence upon which respondent relied was in substance that appellant's servants other than deceased inserted a wash-out plug "in such a manner as to cause steam and hot water to leak out around the same and blow out," and that appellant's servants other than deceased, "failed to inspect said wash-out plug when same was put in place, and to see that the same fitted properly and was tight and would not leak."

The evidence for respondent showed that the deceased was himself foreman of the crew whose duty it was to wash the boilers and fit the engines for use on the road; that he was experienced in work of this character; that the fitting of wash-out plugs was a part of this duty; that an engine with a leaking wash-out plug should not be sent out in that condition; that it was the duty of deceased to know that engines were in proper condition before they were sent out; that the particular engine involved in this case had a leaking wash-out plug; that the boiler was carrying a steam pressure of about 190 or 200 pounds when the leaky plug was discovered; that these facts were reported or known to deceased; that one of his subordinates, an experienced employee, refused to attempt to tighten the plug under pressure, though directed to do so by deceased, and warned deceased that it was dangerous to do so; that deceased, nevertheless, attempted to tighten up the plug without blowing off the steam, and that he was killed while so engaged. It is not denied in the evidence on behalf of respondent, that the appellant company had a standing rule that forbade the tightening of wash-out plugs under pressure, and there is no substantial evidence that this rule had ever been modified or relaxed. While there is no direct evidence as to the identity of the workmen who replaced the

wash-out plug in this instance, yet every legitimate inference from the evidence is that it was replaced by workmen who belonged to the crew of which the deceased was the foreman, and they were therefore under his supervision and control. It is, and was at the time the attempt was made, perfectly plain—all questions of rules or customs aside—that to undertake to tighten up one of these wash-out plugs when the boiler was carrying a pressure of approximately two hundred pounds to the square inch was not only dangerous, but highly so. It appears that a wash-out plug is 3⅝ inches in diameter, and, approximately, ten inches in circumference. A surface of those dimensions is thus exposed to the pressure of the steam in the boiler. No one has, as yet, we believe, succeeded in squaring the circle, but even a crude approximation shows that there must have been a pressure of from 800 to 1000 pounds upon this particular wash-out plug. The screw-threads alone enabled the plug to resist the pressure. The escaping steam was warning both to ear and eye that the threads were cut or that the plug was improperly inserted. In either event, here was clear notice of imminent danger. Deceased was a man experienced in this line of work and upon him rested the duty of correcting this patent defect. Two methods were open to his choice in performing this duty. One—to blow off the steam in the boiler —was easy, obvious and safe, but slow. The other— to tighten the plug under pressure—was speedy and dangerous. He chose the dangerous course. In doing so he acted deliberately, consciously, and free from the spur of any sudden emergency or compelling necessity. That any sensible man should make such a choice always seems—after the event—to be so foolish as to be incredible, but it is a matter of common knowledge that the taking of desperate chances, heedlessly and unnecessarily, is the cause of daily disasters. An automobile laden with passengers, racing for a crossing with a railroad train, or a pedestrian, scurrying across the tracks

in front of a rapidly approaching street-car, are but two of many familiar instances which might be cited. It is axiomatic wisdom that familiarity with danger breeds contempt for it. Many men are so constituted that they will take great risk in order to avoid small trouble. The case in hand is an apt illustration of this fact.

In cases where the evidence tending to support the plaintiff's claim is so vague and unsatisfactory as in this case, we have repeatedly held that in considering a demurrer to the evidence, the court may consider not only the evidence offered in behalf of the plaintiff, but, under appropriate conditions, may also consider the evidence of the defendant. This doctrine was applied in the cases of Jackson v. Hardin, 83 Mo. 175, l. c. 185; Furber v. Bolt & Nut Co., 185 Mo. 301, l. c. 311; Turner v. Anderson, 260 Mo. 1, l. c. 29, and Huffnagle v. Pauley, 219 S. W. 373, l. c. 379. In the Furber case we said:

"In considering whether or not the plaintiff was entitled to go to the jury on this specification we must give him the benefit of every conclusion that could lawfully be drawn from his own evidence, aided, if it is aided, by the evidence of the defendant. Where the evidence of the defendant contradicts that of the plaintiff a question is presented for the jury, not for the court. Yet when the court is asked to authorize a jury to find a fact from the testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture or the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side and if the case is such that the verdict for the plaintiff would necessarily have to be set aside, the court should not submit the question to the jury." [Furber v. Bolt & Nut Co., 185 Mo. l. c. 311-12.]

If we turn, then to the practically uncontradicted evidence introduced in behalf of the appellant in this case, it is at once apparent that the conduct of the decedent in undertaking to tighten the wash-out plug in question while the boiler was full of steam, was in open violation of a rule of the appellant company; that the

decedent knew of this rule; that he had been warned that he would be discharged if found violating it; that he had been specifically instructed in the proper method of correcting such defects as the one here involved; that he had, nevertheless, manifested a disposition to disregard the rule, and had boasted of his ability and willingness to undertake to make such repairs in defiance of the rule of the company, and in contempt of the danger which he thus incurred.

That no recovery can be had under such conditions is too well established to need any citation of authorities. However, there is a case brought—as this case is—under the provisions of the Federal Employers Liability Act, which is so strikingly analogous in principle to the case in hand that we call attention to it in support of the views herein announced. We refer to the case of Great Northern Railway Co. v. Wiles, 240 U. S. 444, l. c. 448. In that case it was the duty of the deceased to display signals to stop an on-coming train in time to prevent a rear-end collision with the train upon which the deceased was brakeman, and which had been stopped at an unusual place because of the pulling out of a draw-bar. The court said:

"There is no justification for a comparison of negligences or the apportioning of their effect. The pulling out of the draw-bar produced a condition which demanded an instant performance of duty by Wiles, a duty not only to himself but to others. The rules of the company were devised for such condition and provided for its emergency. Wiles knew them and he was prompted to the performance of the duty they enjoined (the circumstances would seem to have needed no prompting) by signals from the engineer when the train stopped. He disregarded both. His fate gives pause to blame, but we cannot help pointing out that the tragedy of the collision might have been appalling. He brought death to himself and to the conductor of his train. His neglect might have extended the catastrophe to the destruction of passengers in the colliding train. How impera-

tive his duty was is manifest. To excuse its neglect in any way would cast immeasurable liability upon the railroads and, what is of greater concern, remove security from the lives of those who travel upon them; and therefore all who are concerned with their operation, however high or low in function, should have a full and an anxious sense of responsibility. In the present case there was nothing to extenuate Wiles's negligence; there was. nothing to confuse his judgment or cause hesitation. His duty was as clear as its performance was easy.''

So, in the case at bar, the steam escaping around the wash-out plug evidenced a condition which demanded the performance of a duty by Flack before repairs were undertaken, to-wit, the release of the steam, and that duty he failed to perform. He would not have been harmed but for his conduct in attempting to tighten the wash-out plug under conditions which he knew to be dangerous and forbidden. Until that attempt was made, no one was injured, and but for that attempt there is neither claim nor evidence that any one would have been injured. The inescapable conclusion is that the death of deceased was due to his own negligence, and to that alone. This being true, this cause should not have been submitted to the jury.

III. Appellant contends that the deceased assumed the risks incident to his employment, and that for that reason no recovery can be had in this case.

We think this contention also must be sustained. It is apparent from the testimony in behalf of the respondent, that the deceased was in charge of that department of the work being done by appellant at its round-house in Argentine, Kansas, which had to do with the repairing of defective engines and boilers. It is equally obvious that the particular boiler in question in this case was defective, and was known by the deceased to be so when he undertook to work upon it; and that he possessed all the knowledge which the appellant posessed as to this particular engine

Assumption of Risk.

and the damages incident to the handling thereof. Work of this character is a necessary incident of the business in which the appellant was engaged, and the deceased was specifically charged with the performance of this work. Whatever dangers were naturally or ordinarily incident thereto were assumed by him.    In Hager v. Terminal Railroad Assn., 207 Mo. 302, the plaintiff was an employee of a terminal railroad association whose duty it was, in part, to handle defective cars, and to transfer them from railroad tracks to repair shops or other places where the defects could be repaired. The plaintiff in that case was injured while engaged in handling a defective car, and his injuries were claimed to be due to the defects existing in the car which he was handling. He was aware of these defective conditions.    In that case GRAVES, J., speaking for Division One, all of that division concurring, said, at page 317:

"We have here a servant who admits that he knew the condition of the car.   The question is whether a servant, who by reason of his employment is required to handle both defective and sound cars and is (admittedly) advised of the condition of the car being handled, can recover?   We think not.   If there was danger in this particular car, the servant was as fully advised as was the master.   In handling cars of this character, he, as well as the master, understood that such, in the business performed by the master, had to be handled.   The servant, a man of experience, knew the dangers of his employment, and had personal knowledge of the apparent dangers accompanying the handling of this particular car.   If the car had been run in upon him without knowledge of its condition, the case might be different.   But here we have an admitted knowledge of the condition. The plaintiff knew that the car was 'off center,' and by his experience must have known the dangers incident to the handling thereof.   Knowing that the master was bound to handle defective cars, he was obligated to look out for such cars.   But not placing this opinion upon

that ground, the plaintiff in this case was fully advised as to the character of the car which he was handling, at least as much so as the master, and under no theory of the law can he recover. Giving to plaintiff the broadest theory to which he is entitled, we can discover no legal principle under which his case should have been submitted to the jury. Accident and consequent injury do not authorize a verdict. Under the evidence of this case it was the plain duty of the trial court to have directed a verdict for the defendant.''

This principle is one of familiar application in the decisions of this court. [See Roberts v. Mo. & Kan. Tel. Co., 166 Mo. 370; Junior v. Electric Light Co., 127 Mo. 79, l. c. 83; Steinhauser v. Spraul, 127 Mo. 541, l. c. 562; Nugent v. Milling Co., 131 Mo. 241, l. c. 245, and Thomas v. Railroad, 109 Mo. 187, l. c. 199.]

The same principle has been applied in repeated instances by the United States Supreme Court, in cases arising under the Federal Employers Liability Act. It is true that the defense of assumption of risk is not available under the Federal Employers Liability Act where the violation of ''any statute enacted for the safety of employees contributed to the injury or death of such employee,'' but that exception clearly has no application to the case at bar. Except in cases where there has been a violation by the employer of the provisions of the Safety Appliance Act, the defense of assumption of risk is still a valid defense. [Seaboard Air Line Ry. v. Horton, 233 U. S. 492; Boldt, Admr., v. Pennsylvania R. R. Co., 245 U. S. 441; Jacobs v. Southern R. R. Co., 241 U. S. 229.]

In this State we have repeatedly held that the servant never assumes a risk where that risk is the outgrowth of the master's negligent act, but we have held with equal plainness that he does assume those risks which are necessarily incident to the work in which he is employed. The rule in this State, even under the Federal Employers Liability Act, is that the doctrine of assump-

tion of risk can be invoked as a defense in cases where there is no negligence on the part of the master. [Williams v. Pryor, 200 S. W. 53.]

In view of the facts above cited and of the authorities which we have cited in this paragraph, we think that the trial court erred in refusing the peremptory instruction to find for defendant which appellant requested at the close of all the evidence.

IV.   In a "memorandum of additional authorities," filed since this cause was orally argued, respondent suggests that there is in this case a violation of the Federal Boiler Inspection Act, and that, for that reason, the judgment should be affirmed. This point might well be disregarded for several reasons —among others, that it makes its initial appearance in this case after the case has been briefed, argued and submitted here, or for the further, but related, reason that the case was not tried on that theory in the court below. This lamp should have been filled with oil and should have been trimmed and burning at the beginning rather than at the end of this legal journey. Waiving the tardy appearance of this suggestion, however, it is sufficient in our opinion to say that the act in question has no application to the facts in this case under any circumstances. Section 2 of the Boiler Inspection Act is as follows:

"That from and after the first day of July, nineteen hundred and eleven, it shall be unlawful for any common carrier, its officers or agents, subject to this Act, to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereto are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb, and all boilers shall be inspected from time to time in accordance with the provisions of

this Act, and be able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."

At the time of the accident here in suit, the engine in question was not being used in "moving interstate or foreign traffic," nor was it "in the active service of such carrier in moving traffic" within the intent and purpose of that act, as we construe it. The engine was undeniably being prepared for use in interstate traffic and the deceased met his death while engaged in that preparation. The work then being done was necessary in order to avoid a violation of the provisions of the act whose penalties respondent now invokes. For all of these reasons, this suggestion can avail respondent nothing.

The unfortunate condition of the wife and children of the deceased appeals to our sympathies, but may not sway our judgment. The consequences of carelessness, like the consequences of sin, are usually not confined to the culprit, but commonly fall as well upon innocent heads. For the reasons stated, this judgment cannot stand. Having reached this conclusion, it becomes unnecessary to discuss other questions which appellant presents for our consideration. It follows that this judgment must be reversed. It is so ordered. All concur.